BULLFROG FILMS, INC., et al.,
Plaintiffs–Appellees,

v.

Charles Z. WICK, Director, United States Information Agency, et al.,
Defendants–Appellants.

No. 86–6630.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 1987.

Decided May 17, 1988.

Wendy M. Keats, Appellate Staff Atty., U.S. Dept. of Justice (Civil Div.), Washington, D.C., for defendants-appellants.

David Cole, Center for Constitutional Rights, New York City, Ben Margolis, Margolis, McTernan, Scope & Epstein, Los Angeles, Cal., for plaintiffs-appellees.

Robert B. Broadbelt, ACLU Foundation of Southern California, Los Angeles, Cal., for amici.

Appeal from the United States District Court for the Central District of California.

Before BROWNING, FLETCHER and POOLE, Circuit Judges.

POOLE, Circuit Judge:

This appeal is brought by the United States Information Agency (USIA), as the federal agency charged with the domestic administration of the Beirut Agreement, a multilateral treaty aimed at facilitating the international circulation of "educational, scientific and cultural" audio-visual materials. Under the treaty, qualifying materials receive various benefits, including exemption from import duties. A certificate of international educational character is a necessary prerequisite to the receipt of treaty

benefits. Owners of American materials must apply to the USIA for such certificates. Plaintiffs-appellees are film makers, production and distribution companies and a membership association, all of whom have an interest in one or more films that were denied certification. In their complaint, plaintiffs alleged that the regulations employed by the USIA to implement the treaty were unconstitutional. On a motion for summary judgment, the district court agreed, holding that three of the regulations are facially unconstitutional, in violation of the First and Fifth Amendments.

For reasons set forth below, we affirm.

## I.

### A.

The Beirut Agreement,[1] the outgrowth of a proposal by the United States delegation to the General Conference of the United Nations Educational, Scientific and Cultural Organization (UNESCO) at its third session in Beirut, Lebanon, in 1948, entered into force on August 12, 1954. S.Rep. No. 1626, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Admin.News 3143, 3143–44 (S.Rep. No. 1626). The United States Senate ratified the Agreement on May 26, 1960, but deposit of ratification was withheld pending the enactment of implementing legislation. *Id.* On October 8, 1966, Congress passed the necessary implementation statute, Pub.L. No. 89–634; 80 Stat. 879 (1966), and formal operations by the United States under the Agreement commenced January 12, 1967. 22 C.F.R. § 502.1.

According to its Preamble, the purpose of the Agreement is to facilitate the international circulation of audio-visual materials that are of an "educational, scientific and cultural character." This objective is portrayed as part of a larger effort to promote the "free flow of ideas by word and image" and encourage "the mutual understanding of peoples."

To achieve these ends, contracting States agree to accord certain benefits to qualifying materials. These benefits include exemption from customs duties, import licenses, special rates, quantitative restrictions and other restraints and costs. Art. III, ¶¶ 1, 3. The value of these benefits to those seeking to export audio-visual materials can be substantial.[2]

Securing favorable treatment under the Agreement is a two-step process. First, the exporter must obtain a certificate from the appropriate governmental agency in the country of the material's origin attesting to the item's educational, scientific or cultural character. Art. IV, ¶¶ 1–2. Second, the certificate must be filed with the appropriate governmental agency of the contracting State into which entry is sought. That agency must then decide for itself whether the material presented qualifies for benefits under the Agreement. Art. IV, ¶ 4. The decision of the importing state is final. Art. IV, ¶ 6.

Article I of the Agreement offers the following broad standards for judging whether materials qualify as educational, scientific or cultural:

Visual and auditory materials shall be deemed to be of an educational, scientific and cultural character:

(a) when their primary purpose or effect is to instruct or inform through the development of a subject or aspect of a subject, or when their content is such as to maintain, increase or diffuse knowledge, and augment international understanding and goodwill; and

(b) when the materials are representative, authentic, and accurate; and

(c) when the technical quality is such that it does not interfere with the use made of the material.

---

1. Opened for signature July 15, 1949, 17 U.S.T. 1578, T.I.A.S. No. 6116, 197 U.N.T.S. 3.

2. According to one source, film makers may be confronted by duties of up to $50,000 per print.

Robinson, *Silenced Screens: The Role of the United States Information Agency In Denying Export Certificates to American Films*, 17 N.Y.U. J.Int'l L. & Pol. 77, 77–78 (1978).

When Congress, in 1966, enacted implementing legislation, it authorized the President to designate a federal agency to "take appropriate measures for the carrying out of the provisions of the Agreement including the issuance of regulations." Pub.L. No. 89–634; 80 Stat. 879. Pursuant to this Congressional delegation, the USIA, the selected agency, issued regulations to facilitate the implementation of the Agreement. *World–Wide Free Flow (Export–Import) of Audio–Visual Materials*, 22 C.F.R. §§ 502.1–502.8. Under these regulations, applications for certificates of international educational character are reviewed by the Agency's Chief Attestation Officer or his subordinates. If certification is denied, the regulations provide for appeal to a Review Board, and, as a last resort, to the director of the USIA. 22 C.F.R. § 502.5(b)–(c).

In addition to setting application procedures, the USIA's implementing regulations establish "substantive criteria" for determining eligibility for certification. 22 C.F.R. § 502.6. Three of these regulations were held by the district court to be unconstitutional on their face and are at issue in this appeal. The first regulation repeats verbatim the definition of "educational, scientific or cultural" found in Article I of the Agreement. 22 C.F.R. § 502.6(a)(3). The other two regulations were promulgated by the USIA to assist in the "interpretation" of the Article I criteria. Section 502.6(b)(3) provides:

The Agency does not certify or authenticate materials which by special pleading attempt generally to influence opinion, conviction or policy (religious, economic, or political propaganda), to espouse a cause, or conversely, when they seem to attack a particular persuasion....

Section 502.6(b)(5) reads as follows:

The Agency does not regard as augmenting international understanding or good will and cannot certify or authenticate any material which may lend itself to misinterpretation, or misrepresentation of the United States or other countries, their peoples or institutions, or which appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices.

**B.**

Plaintiffs-appellees are independent film makers, film production and distribution companies and a membership association. They brought suit in the district court to challenge the constitutionality of two of the USIA regulations referred to in the previous section, 22 C.F.R. §§ 502.6(b)(3) and (b)(5), after the USIA refused to certify seven of their films as "educational, scientific, or cultural" under the Agreement.

The films denied certification cover a wide range of topics and are described briefly by appellees as follows: (1) *In Our Own Backyards: Uranium Mining in the United States* looks at "the effects of uranium mining on the environment and on the health of those who work in or live near the mines"; (2) *Save the Planet* presents "a film history of the atomic age"; (3) *Ecocide: A Strategy of War* "documents the environmental impact of United States military tactics in Vietnam"; (4) *From the Ashes ... Nicaragua Today* "traces the historical roots of the 1979 Nicaraguan Revolution"; (5) *Whatever Happened to Childhood?* "addresses the changing reality facing children growing up in modern-day urban America, principally through first-hand interviews and statistical evidence"; (6) *Peace: A Conscious Choice* "attempts to teach its viewers about the first step toward peace in a Cold War society, by suggesting that the United States and the Soviet Union are inextricably related, and that their relationship has implications for world peace"; (7) *The Secret Agent* "examines the use and effects of dioxin, a toxic ingredient in Agent Orange, through archival footage and interviews." Aples.' Br. at 6–11. Many of these films are the recipients of prizes, awards and other forms of critical acclaim.

The district court granted plaintiffs' motion for summary judgment, finding both §§ 502.6(b)(3) and (b)(5) facially violative of the First and Fifth Amendments. *Bullfrog Films, Inc. v. Wick*, 646 F.Supp. 492, 510 (C.D.Cal.1986). The court, *sua sponte*, also granted summary judgment to plaintiffs

with respect to the facial invalidity of § 502.6(a)(3). *Id.* It went on to permanently enjoin the USIA from enforcing the three regulations and ordered the Agency to reconsider the eligibility of plaintiffs' films under constitutionally sound standards. *Id.* at 510–11.[3]

The USIA now appeals.

## II.

■ Our initial concern is with the USIA's argument that plaintiffs-appellees lack standing to challenge the Agency's regulations. Rejecting the conclusions of the district court, the USIA contends that plaintiffs have failed to meet the requirements for Article III standing set forth in *Valley Forge Christian College v. Americans United For Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).[4] We disagree.

## A.

The requirement that a plaintiff present an injury in fact is satisfied by the showing of a pecuniary injury. *Data Processing v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). By alleging they have had to pay customs duties to export to Canada four of their films, plaintiffs discharge this burden.[5] Plaintiffs also satisfy this requirement by alleging that the denial of benefits under the Agreement puts their films at a competitive disadvantage in the international marketplace, resulting in the loss of sales. *See Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 636 n. 6, 9 L.Ed.2d 584 (1963). Although plaintiffs did not produce evidence that the payment of customs duties or other barriers caused decreased sales or profits, at the summary judgment stage, a plaintiff's allegations need not be proven but merely provable. *United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed. 2d 254 (1973).

We also find merit in plaintiffs' contention that the denial of USIA certification works a cognizable injury to their ability to compete for benefits under the Agreement. Such competitive injuries have often been recognized as grounds for standing. *Regents of University of California v. Bakke,* 438 U.S. 265, 280–81 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (university decision not to permit plaintiff to compete for all 100 places in entering medical school class); *Preston v. Heckler,* 734 F.2d 1359, 1365 (9th Cir.1984) (failure of government agency to adopt standards that would enable plaintiff to be considered for employment); *Glacier Park Foundation v. Watt,* 663 F.2d 882, 885 (9th Cir. 1981) (federal agency's statutory violations rendered plaintiff "unable to compete on an equal basis" for concession contract). *Cf. Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 261–63, 97 S.Ct. 555, 561–63, 50 L.Ed.2d 450 (1977) (refusal of city to rezone precluded possibility of construction of low income-housing). Here, it is undisputed that a certificate of

---

**3.** Plaintiffs also alleged that (1) §§ 502.6(a)(3), (b)(3), and (b)(5) are invalid as applied, and (2) the USIA illegally delegated its authority to grant or deny certificates to "non-neutral" agencies. The district court did not have occasion to reach these claims, and we do not do so herein.

**4.** At an "irreducible minimum" Article III standing requires that a plaintiff show (1) "that he personally has suffered some actual or threatened injury" as a result of defendant's conduct, (2) that the injury "fairly can be traced to the challenged action" and (3) that the injury "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United For Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). *See also Fair v. United States E.P.A.,* 795 F.2d 851, 853 (9th Cir.1986); *Preston v. Heckler,* 734 F.2d 1359, 1364 (9th Cir.1984).

**5.** Plaintiffs present a Canadian customs form which shows that on July 2, 1987 Churchill Films paid $67.00 in duties to export a copy of *Whatever Happened to Childhood?.* Similar documentation shows that on June 11, 1986 Green Mountain Post Films paid $3.41 to export a copy of *Save the Planet* and $2.56 for a copy of *Ecocide: A Strategy of War.* (While it is not clear whether the amounts reflect U.S. or Canadian dollars, the disparity in duties paid reflects the differentiation in film valuation.) Plaintiffs also present the affirmation of Melanie Maholick, Secretary–Treasurer of the International Women's Film Project, Inc. attesting to the payment "on several occasions" of duties for exporting *From the Ashes … Nicaragua Today* into Canada.

**507**

international educational character is, as the district court found, an "indispensable prerequisite" to the realization of benefits under the Agreement. 646 F.Supp. at 501; *see* Treaty, Art. IV, ¶ 1. The USIA acknowledged as much when in its briefs below it stated that USIA certificates are the *"sine qua non* for receipt of customs exemptions." 646 F.Supp. at 502. We therefore find that plaintiffs have sustained a competitive injury because by denying certification the USIA has deprived them of the opportunity to obtain favorable treatment under the Agreement.[6]

### B.

The USIA takes the position that even if the injury in fact requirement is met, none of the alleged injuries is likely to be redressed by a favorable judgment because importing states will necessarily reject plaintiffs' films. We reject this contention. First, we are not persuaded that all Beirut Agreement signatories employ precisely the same implementing regulations, *i.e.* the regulations promulgated by the USIA. So far as we can discern, with the exception of Canada, none of the approximately sixty other Beirut Agreement participants, *see* 22 C.F.R. § 502.7(e), has promulgated any formal regulations to implement the Treaty whatsoever. Nevertheless, appellants ask us to conclude that the absence of any contrary regulations establishes the *de facto* adoption of the USIA's regulations by the other countries. We do not find support in fact for that conclusion.[7] Second, even if it could be established that all other signatory nations had adopted the USIA's regulations, appellants would still have the burden of showing that the regulations are uniformly applied. Otherwise, it could not be said that certification of plaintiffs' materials would certainly lead to their rejection by any and all importing nations. The inherent ambiguity and subjectivity of the regulations makes in our judgment such a double coincidence far less than a sure bet. Moreover, the fact that the USIA has in the past rejected films certified by Canada serves as proof that authorities in two countries with the same regulations do not always concur. *See* Aples.' Br. at 17 n. 11.

At present, there is no disagreement among the parties that USIA certificates are accepted by importing states as a matter of course. We see no reason why this practice would change dramatically if the USIA certified films such as plaintiffs. Accordingly, we conclude that there is a substantial likelihood that plaintiffs' pecuniary injuries are "likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed. 2d 556 (1984).

Redress seems even more certain for the injury plaintiffs allege to their ability to compete for Beirut Agreement benefits. If plaintiffs' films are certified by the USIA, they at least stand a chance of winning

6. At oral argument, counsel for the USIA suggested that benefits approximating those attainable under the Agreement might be available through other channels. We find this contention meritless because (1) there is no evidence that there exists more than a theoretical possibility that comparable benefits might somehow be obtained, and (2) without a USIA certificate plaintiffs may not receive benefits *under* the Agreement. Even if similar benefits could be had through what can only be presumed to be the largesse of a foreign government, the need to hurdle special obstacles is itself a detriment which confers standing. *Meese v. Keene,* — U.S. ——, 107 S.Ct. 1862, 1868–69, 95 L.Ed.2d 415 (1987); *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

Plaintiffs also allege standing on the ground that the regulations impair their First Amendment rights. The district court, without deciding, indicated that it approved this argument.

*See* 646 F.Supp. at 500 n. 12. Because we find that plaintiffs adequately allege standing on other grounds, we decline the invitation to decide this issue.

7. Appellants cite a UNESCO document titled "A Guide to the Operation of the Agreement for Facilitating the International Circulation of Visual and Auditory Materials of an Educational, Scientific and Cultural Character," Aplts.' Br. Addendum at 20, in an effort to prove that all other Treaty participants have *de facto* adopted USIA-like regulations. The UNESCO document, however, which appellants refer to as the "UNESCO Guidelines," are not in fact guidelines at all with respect to determinations of eligibility for certification. The document merely reports that "certain participating countries" have adopted special regulations. It does not require, or even encourage, other countries to follow suit.

foreign acceptance. Without a certificate, they have no possibility of even being considered by other countries for duty and licensing exemptions. Opening the door to the possibility of obtaining sought after benefits is sufficient to satisfy the redress requirement. *Bakke,* 438 U.S. at 280 n. 14, 98 S.Ct. at 2743 n. 14; *Preston,* 734 F.2d at 1366; *West Virginia Assn. of Community Health Centers v. Heckler,* 734 F.2d 1570, 1576 (D.C.Cir.1984).[8]

### III.

■ In the interests of judicial economy, the court should decide this case on nonconstitutional grounds, if possible. Thus, we first consider appellees' contention that the two interpretive regulations, §§ 502.-6(b)(3) and (5), offend the Agreement, and are therefore invalid.

In order for regulations to be valid, they must be consistent with the legislation under which they are promulgated. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936). If they are not, they are void as contrary to law. 5 U.S.C. § 706(2)(A); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980).

The USIA regulations were enacted pursuant to Pub.L. No. 89–634. This implementing legislation was obviously intended to give the USIA broad discretion by authorizing it "to take appropriate measures for carrying out the provisions of the Agreement including the issuance of regulations." The legislative history adds nothing to limit the scope of the USIA's discretion. *See* S.Rep. No. 1629. Thus, whether the USIA has acted in conformity with

Pub.L. No. 89–634 turns on the language of the Treaty itself.

Appellees maintain that the Treaty's broad definition of "educational, scientific and cultural" excludes interpretations which narrow its scope. They contend that even if their films do attempt to influence opinion, espouse a cause or attack a political view or persuasion, in violation of 22 C.F.R. 502.6(b)(3) and (5), they remain within the Treaty's definition of educational because they nevertheless serve to instruct, inform and increase knowledge. Any materials which satisfy the Article I definition, appellees emphasize, "shall" be deemed educational in character. Appellees therefore insist that the regulations are invalid because they deny certification to materials that, under a broad reading of the Treaty definition, presumably qualify as educational. The district court rejected appellees' contention. It held that "the Treaty's language is so broad that it provides no standards against which the Court can judge the Agency's regulations." 646 F.Supp. at 500–01.

While we hesitate to say that the Treaty provides "no standards", we do agree that the language is extremely broad and susceptible to multiple interpretations. While the USIA regulations do not provide the widest possible definition of what is educational, scientific or cultural, they are not so restrictive that we may find them inconsistent with Pub.L. 89–634's broad mandate. The fact that the Canadian regulations are similar to those challenged here, and that UNESCO referred to them without criticism, underscores our conclusion. Unable to resolve this case on statutory grounds, we proceed to the constitutional issues.

---

8. This is not a case such as *Fernandez v. Brock,* 840 F.2d 622 (9th Cir.1988), where it is merely speculative as to whether the relief sought will increase the plaintiffs' opportunity to seek benefits. In *Fernandez,* migrant farm workers sought to compel the Secretary of Labor to issue regulations under ERISA governing pension plans for seasonal employees. We held that because the plaintiffs could only speculate what those regulations might be and whether their employers would continue to participate, they could not establish that the relief sought would increase their opportunity to receive pension benefits. 840 F.2d at 626–28 (*citing Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), and *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Here, by contrast, it is clear that certification of plaintiffs' films would increase plaintiffs' opportunity to compete for benefits under the Beirut Agreement.

## IV.

### A.

■ Before we can determine whether the regulations are constitutional, we must first ascertain the appropriate level of scrutiny. We are guided in our inquiry by the understanding that "[g]enerally, statutory classifications are valid if they bear a rational relation to a legitimate governmental purpose. Statutes are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech...." *Regan v. Taxation With Representation*, 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983). Our initial concern, therefore, is whether the regulations impinge on the exercise of plaintiffs' First Amendment rights.[9]

Appellants argue that the regulations do not implicate the First Amendment because they do not punish or directly obstruct plaintiffs' ability to produce or disseminate their films. We disagree both with appellants' benign characterization of the effect of their regulations and with their limited reading of the requirements of the First Amendment.

As they did below, appellants seek to characterize this as a case of the government simply declining to pay a subsidy, as in *Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed. 2d 129 (1983), where the Court held that the government may withhold a tax subsidy from nonprofit public interest organizations if they engage in political lobbying. The challenged statute and regulations in *Regan* distinguished lobbying from informational and charitable activities, and reflected Congress' choice under the spending power to refuse to use Treasury funds to subsidize the lobbying activity. In upholding this distinction, the Court relied on the fact that the lobbying restriction was neutral as to content and not aimed at the suppression of particular ideas. *Id.* at 548, 103 S.Ct. at 2002.[10] Our case is fundamentally different. Here, the challenged regulations discriminate based on content within given media of expression. Moreover, here, no Treasury Department funds are involved. As the district court observed, if any "subsidy" is to be paid at all, it "would come from the treasuries of the foreign states that agree to waive their customs duties." 646 F.Supp. at 501. *See also* Christ, *The Beirut Agreement: A License to Censor?*, 7 Loy.L.A.Int'l & Comp.L.J. 255, 268–69 & n. 97 (1985).

Nor do we find *Harris v. McRae*, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687, 65 L.Ed. 2d 784 (1980), holding that a state need not subsidize abortions although it subsidizes other medical procedures, including childbirth, to be controlling authority. The Court, in *Harris* reasoned that "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation." 448 U.S. at 316, 100 S.Ct. 2688. *See also Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed. 2d 484 (1977). Here, by contrast, the government's denial of certification constitutes an absolute barrier to benefits under the treaty.

Appellants argue that the regulations do not "interfere" with plaintiffs' freedom of speech because they do not draw distinctions on the basis of the speaker's point of view. Whether the regulations are indeed "viewpoint neutral", as appellants assert, is doubtful.[11] However, the Supreme Court

---

**9.** A logically prior question, whether the First Amendment applies abroad, was raised by the district court. After receiving supplemental briefing, the court concluded: "[T]here can be no question that, in the absence of some overriding governmental interest such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders." 646 F.Supp. at 502. Neither party challenges the district court's well-reasoned conclusion on appeal. We therefore find it unnecessary to revisit the issue.

**10.** The Court further observed that the organization could express its views and still get the tax subsidy by returning to its "dual structure" in which a separate, affiliated organization did the lobbying. 461 U.S. at 544, 103 S.Ct. at 2000.

**11.** Discrimination against the expression of particular points of view is especially disfavored, because "[t]here is an 'equality of status in the

has made it clear that legislation "does not evade the strictures of the First Amendment merely because it does not burden the expression of particular *views*...." *Arkansas Writers' Project, Inc. v. Ragland,* — U.S. ——, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987). Even if the regulations could be deemed neutral with respect to their burden on viewpoint, they may still be found to "interfere" with the exercise of plaintiffs' free speech interests if they improperly discriminate between exercises of protected speech on the basis of content. *See FCC v. League of Women Voters,* 468 U.S. 364, 383–84, 104 S.Ct. 3106, (1984); *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 518–19, 101 S.Ct. 2882, 2898, 69 L.Ed. 2d 800 (1981) (plurality opinion); *Consolidated Edison Co. v. Public Service Comm'n of New York,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980); *Carey v. Brown,* 447 U.S. 455, 462 n. 6, 100 S.Ct. 2286, 2291 n. 6, 65 L.Ed.2d 263 (1980); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).

The challenged regulations require that in order to be certified, a film must be balanced and truthful; must neither criticize nor advocate any political, religious, or economic views; and must not "by special pleading" seek to influence opinion or poli-

cy. Each of these requirements draws content-based lines forbidden by the First Amendment.

The danger inherent in government editorial oversight, even in the interest of "balance," is well established. In *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), a unanimous Court struck down a Florida statute which required newspapers in the state to present balanced campaign coverage by publishing candidates' replies to editorial criticism of the candidate. According to the Court, "[i]t has yet to be demonstrated how governmental regulation of [the editorial] process can be exercised consistent with the First Amendment." *Id.* at 258, 94 S.Ct. at 2840. The USIA has gone so far as to deny certificates not only because certain views were assertedly missing, but also because viewpoints mentioned were, in the government's editorial judgment, insufficiently highlighted. However, the First Amendment does not allow the government to require independent filmmakers to present all views on a subject, or indeed any view contrary to the filmmakers' own. *See Big Mama Rag, Inc. v. United States,* 631 F.2d 1030 n. 18 (D.C.Cir.1980).

---

field of ideas,' and government must afford all points of view an equal opportunity to be heard." *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

Appellants acknowledge that the regulations forbid certification of films that "present a point of view." Plaintiffs' Statement of Uncontroverted Facts, ¶ 5, ER at 45. *In our Own Backyards,* for example, was denied certification not because of its general subject-matter—nuclear energy—but because it expressed "a point of view" on that subject. However, *Radiation ... Naturally,* a film on the same subject with the opposite point of view, was granted an educational certificate. Arguably, *In Our Own Backyards* was denied certification because its viewpoint was one with which USIA and Department of Energy officials did not agree.

Nevertheless, appellants argue that the regulations are not viewpoint-based because rather than forbidding particular viewpoints, they forbid all points of view. This argument is flawed for two reasons.

First, even if we were to accept the proposition that criteria such as "balance," "viewpoint

neutrality" and "objectivity" lend themselves to clear and uniform application, we note that the regulations, taken as a whole, are not viewpoint neutral. By denying certification to materials which "espouse a cause," "attack a particular persuasion," or "lend [themselves] to misinterpretation, or misrepresentations of the United States or other countries, their peoples or institutions, or which appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices," the regulations seem to disapprove materials that criticize and approve those that accept the prevailing state of affairs on a given topic. This slant in the regulations has been amply demonstrated in the practices of the USIA.

Second, we agree with the district court that "[o]ur nation considers the free exchange of ideas to be central to the educational process.... Thus, any definition of 'educational' that is constitutionally acceptable must accommodate materials that purport to reach a conclusion or take a stand." 646 F.Supp. at 507 (citing *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), quotation omitted).

The USIA's proscriptions on films that "attempt generally to influence opinion" or to espouse or criticize a cause or policy are also unconstitutional, because they limit expressions of opinion on issues of public controversy. *See Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (striking down order forbidding public utilities from using bill inserts to discuss "controversial issues of public policy"); *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (striking down prohibition on editorializing by public broadcasting companies). Regulations based on the political or controversial subject matter of speech are particularly invidious, for they restrict public debate in that area most privileged by the First Amendment. *League of Women Voters,* 468 U.S. at 381, 104 S.Ct. at 3118; *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) ("expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'") *Cf. Police Dep't of Chicago v. Moseley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").

In sum, we find that the regulations plainly interfere with the exercise of plaintiffs' First Amendment rights. First, they disadvantage materials on the basis of content. Non-certified materials are entirely ineligible to receive benefits under the Agreement, including the waiver of import duties. Such content-based distinctions are patently offensive to the First Amendment. *See Arkansas Writers' Project, Inc. v. Ragland,* —— U.S. ——, 107 S.Ct. 1722, 1726–28, 95 L.Ed.2d 209 (1987). Second, by conditioning a valuable governmental benefit on the basis of speech content, the USIA forces film makers to choose between exercising their right to free speech and foregoing benefits under the Agreement, or curtailing their speech and obtaining the benefits. The imposition of this sort of dilemma patently transgresses the well-established principle that government may not condition the conferral of a benefit on the relinquishment of a constitutional right:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit.... [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). *See also Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). For these reasons we conclude that the regulations infringe the First Amendment and warrant the imposition of strict scrutiny.

### B.

■ As a result of our determination that appellants' content-based regulations infringe the First Amendment, appellants' burden in attempting to uphold its regulations is heavy. In order to justify its scheme for awarding Beirut Agreement certificates, appellants must demonstrate that their regulations are "necessary to serve a compelling state interest" and are "narrowly drawn to achieve that end." *Arkansas Writers' Project,* 107 S.Ct. at 1728; *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

Relying on its earlier argument that the "rational relation" standard of review applies, the USIA makes no effort to discharge this higher standard. Instead, the government argues that a deferential level of scrutiny is appropriate because USIA certification decisions implicate "the delicate area of foreign relations." Appellant's Br. at 32. We agree with the district court in rejecting the suggestion that the First Amendment's protection is lessened when the expression is directed abroad. 646 F.Supp. 503–04.

The cases cited by the government do not support its contention that otherwise protected free speech interests may be routinely subordinated to foreign policy concerns. In these cases, the Supreme Court either found the speech to be unprotected, *see Haig v. Agee,* 453 U.S. 280, 284–85 & n. 7, 308–09, 101 S.Ct. 2766, 2770 & n. 7, 2782–83, 69 L.Ed.2d 640 (1981) (disclosures damaging to intelligence operations and threatening to lives of American personnel are not protected by First Amendment), or else found that no content-based restrictions on speech were involved in government-imposed travel restrictions. *See Regan v. Wald,* 468 U.S. 222, 241–42, 104 S.Ct. 3026, 3037, 82 L.Ed.2d 171 (1984) (upholding content- and viewpoint- neutral restrictions on travel to Cuba); *Zemel v. Rusk,* 381 U.S. 1, 13, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965) (same). Indeed, the Supreme Court has recently held that the government's interest in obeying its international law obligation to safeguard the "dignity" of foreign embassies and diplomats was not "automatically" to be regarded as " 'compelling' for purposes of First Amendment analysis." *Boos v. Barry,* —— U.S. ——, 108 S.Ct. 1157, 1165, 99 L.Ed.2d 333 (1988) (striking down content-based restriction on display of placards critical of foreign governments outside those governments' embassies). As the district court aptly stated:

> it is clear that there is no "sliding scale" of First Amendment protection under which the degree of scrutiny fluctuates in accordance with the degree to which the regulation touches on foreign affairs. Rather, the only permissible non-neutral inquiry into the content of the speech is whether the statements adversely affect foreign policy interests to such a degree that the speech is completely unprotected. As *Haig v. Agee* itself indicates, the clearest example of the kind of compelling government interest that would lead to such a result is where the speech poses a clear and direct threat to national security.

646 F.Supp. at 504.

We do not perceive the existence of a compelling state interest, and the government advances none. Certainly the existence of a Treaty does not by itself justify content-based discrimination in violation of the First Amendment. *See Boos v. Barry,* 108 S.Ct. at 1165; *see also Reid v. Covert,* 354 U.S. 1, 16–19, 77 S.Ct. 1222, 1230–31, 1 L.Ed.2d 1148 (1957). Moreover, we are not presented here with the sort of delicate foreign policy matter best entrusted to the political branches. *Cf. Regan v. Wald,* 468 U.S. at 242, 104 S.Ct. at 3037 (upholding restrictions on travel to Cuba). Nor do we find that the regulations are narrowly drawn. Accordingly, we agree with the district court that the challenged regulations violate the First Amendment.

## V.

■ Due process requires that insufficiently clear regulations be held void for vagueness. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). Laws that are vague are objectionable on a number of grounds. First, they may "trap the innocent by not providing fair warning." *Id.* Second, "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–109, 92 S.Ct. at 2298–99. Third, a vague statute that implicates First Amendment freedoms discourages the exercise of those freedoms: "Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.' " *Id.* at 109, 92 S.Ct. at 2299.

Not surprisingly, where the guarantees of the First Amendment are at stake the Court applies its vagueness analysis strictly. In invalidating a New York State teacher loyalty law on grounds of unconstitutional vagueness, the Court stated:

> We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," *N.A.A.C.P. v.*

*Button,* 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405]; "[f]or standards of permissible statutory vagueness are strict in the area of free expression.... Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.,* at 432–433 [83 S.Ct. at 337–338].

*Keyishian v. Board of Regents,* 385 U.S. 589, 603–04, 87 S.Ct. 675, 684, 17 L.Ed.2d 629] (1967).

In this case, the district court decided that §§ 502.6(b)(3) and (5) were "unquestionably ... unconstitutionally vague," adding: "these regulations are not merely 'flexible'; they are boundless." 646 F.Supp. at 505. The district court drew the same conclusion with respect to § 502.6(a)(3). *Id.* at 507.

Appellants contend first that because the certificates are simply an expression of governmental opinion, and do not confer or deny any benefits or interfere with any activity, the certification process does not implicate constitutional considerations, including the right to due process. This contention clearly fails for reasons stated in the preceding section of this opinion.

Second, appellants argue that a greater degree of vagueness is tolerated with respect to civil enactments, as opposed to criminal, "because the consequences of imprecision are qualitatively less severe." *Hoffman Estates v. Flipside,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). While this may be true generally, it is not the case where constitutional rights are at issue. *See Keyishian, supra.* In fact the Court in *Hoffman Estates* makes this very point:

> perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. *If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.*

455 U.S. at 499, 102 S.Ct at 1193 (emphasis added).

Appellants further contend that the regulations survive the vagueness challenge because "they are set out in terms that the ordinary person exercising ordinary common-sense can sufficiently understand and comply with." Aplts.' Br. at 36, *quoting United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973). The validity of appellants, assertion is called into serious doubt by an examination of the language of the regulations themselves. Under 502.6(b)(3) the Agency does not certify materials which "by special pleading attempt generally to influence opinion conviction or policy ... espouse a cause, or ... seem to attack a particular persuasion." An ordinary person would be hard pressed to define "special pleading." He would also be unlikely to know precisely what it means to "attempt generally to influence opinion, conviction or policy," or "to espouse a cause." Some attempt to influence policy would seem to be permitted. How much? When does material "seem to attack a particular persuasion"? When does it not? What is a "persuasion"?

Section 502.6(b)(5) is equally mystifying. By what standard does the USIA decide whether material lends itself to "misinterpretation, or misrepresentation of the United States or other countries, their peoples or institutions"? When do materials "appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices"?

As for 502.6(a)(3), though it tracks the language of the Treaty, it too is highly ambiguous. Material may be certified if its "content is such as to ... augment international understanding and good will." It must also be "representative", "authentic" and "accurate". This terminology is unquestionably vague.

One might perhaps make some educated guesses as to the meaning of these regulations, but one could never be confident that the USIA would agree. We agree with appellees that "[t]o the extent that they are susceptible to interpretation at all, they appear to preclude virtually anything that

someone would consider either educational or a documentary." Aples.' Br. at 31.

The constitutional infirmity of the regulations is well illustrated by comparing them with those at issue in *Big Mama Rag v. United States*, 631 F.2d 1030 (D.C.Cir. 1980), in which a nonprofit feminist organization denied tax-exempt status by the IRS challenged for vagueness a regulation defining educational institutions. The regulation, in pertinent part, provided:

> An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a *sufficiently full and fair exposition of the pertinent facts* as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.

*Id.* at 1034 (emphasis supplied). The court, in a lengthy discussion, held the regulation unconstitutionally vague. *Id.* at 1035–39. *See also Beckerman v. City of Tupelo*, 664 F.2d 502, 507 (5th Cir.1981) (ordinance void for vagueness which authorized police chief to deny parade permit where "conduct of the parade will probably cause injury to persons or property or provoke disorderly conduct or create a disturbance"; court held: "This provision is unconstitutionally vague since it contains no instructions directing the Chief in the formulation of his opinion.").

The cases cited by USIA do not help its cause. *FEC v. Furgatch*, 807 F.2d 857 (9th Cir.1987), does not involve a vagueness challenge. As for *United States Civil Service Commission v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), we are satisfied that they are distinguishable for the reasons stated by the Supreme Court in *FCC v. League of Women Voters*, 468 U.S. at 401 n. 27, 104 S.Ct. at 3128 n. 27 (challenged Hatch Act provisions differed from content discrimination in that they 1) deal with government employees' active political participation; 2) are grounded in government's interest in employee job performance; and 3) are based on a century of experience with less restrictive alternatives).

We therefore find that the regulations are unconstitutionally vague. The regulations enable USIA officials to "act in an arbitrary and discriminatory manner in granting or denying permits and still be completely within the scope of their regulations." Amicus Br. at 43. This kind of unfettered discretion is patently offensive to the notion of due process.

## VI.

In conclusion, we hold that plaintiffs-appellees clearly have standing to sue. They allege adequate injuries in fact in the form of pecuniary losses and deprivation of the opportunity to compete for valuable treaty-benefits. We are also satisfied that there is a substantial likelihood of redress.

In addition, we find that the USIA regulations violate, on their face, the First Amendment. By withholding a valuable benefit on the basis of speech-content, the regulations plainly implicate plaintiffs' First Amendment rights and are therefore subject to strict scrutiny analysis. Under this rigorous standard of review, the regulations do not pass constitutional muster: they are neither justified by a compelling government purpose nor narrowly tailored.

We also hold that the regulations are void for vagueness under the Due Process Clause of the Fifth Amendment. The regulations are so ambiguous that they provide USIA officials with a virtual license to engage in censorship. In this case, that license has been exercised.

We recognize that the implementation of the Beirut agreement requires some content-based judgments. We do not hold that "educational, scientific and cultural" materials cannot be identified by regulations that pass constitutional muster. Such regulations, however, must be more narrowly tailored and clearly drawn than those before us today.

AFFIRMED.