Argued February 11, affirmed as modified March 9, 1960

## PATECKY *v.* FRIEND ET AL

350 P. 2d 170

*Wilber Henderson,* Portland, argued the cause for appellants. With him on the briefs was Earl F. G. Hurlburt, Portland.

*Philip A. Levin* and *William M. Keller,* Portland, argued the cause for respondent. With Philip A. Levin on the brief were Keller & Keller, Portland.

Before McAllister, Chief Justice, and Lusk, Sloan and Duncan, Justices.

DUNCAN, J. (Pro Tempore)

Defendants appeal from a decree in equity based on findings of fact and conclusions of law of the circuit court for Multnomah county, holding that plaintiff, Blanche F. Patecky, is entitled to the entire net estate of Samuel Friend, deceased, by virtue of an oral agreement between that decedent and his former wife, Emma, whereby they contracted to leave all their property respectively to the survivor of them, and the survivor to leave all his or her property to plaintiff, their daughter and only child.

Defendant Lillian A. Friend was the second wife of and is the widow of Samuel and executrix of his estate. Defendant Jindra Bunn, unrelated to any party, is a legatee under the will. For convenience the parties other than plaintiff will be referred to by their given names.

Samuel and Emma intermarried in 1901. They worked at separate occupations for a time. From 1916 to 1922 they jointly operated stores and went broke in the latter year. In 1932 Samuel acquired the "beginnings" of Friend's Hardware Store, and Emma worked there regularly until 1943, when her health became poor. In 1944 Samuel and Emma made a partnership agreement in writing for the operation of that store for a period of 10 years under the assumed name of Friend's Hardware Store, to share equally in profits and losses. Simultaneously, Samuel executed to Emma a bill of sale covering an undivided one-half interest in the gross assets of that business. No mention was

made of the future disposition of this or any other property.

In March, 1944, attorney Edward A. Boyrie prepared for Samuel and Emma, at their request, mutual and reciprocal wills. On the 30th of that month the testators executed the wills before Mr. Boyrie and another witness. Copies of the wills were produced by Mr. Boyrie. Emma's original will is in evidence, but Samuel's original will was not produced. Under said will Samuel gave all his property to Emma if she survived him, but if she predeceased him, the property was given to plaintiff. Emma's will was identical, except that she gave everything to Samuel if he survived her. Emma died February 9, 1953, and her said will was probated with Samuel as executor. The estate approximated $20,000, all of which was distributed to Samuel.

Samuel, then 76 years of age, married Lillian on May 25, 1955, thereby effectually revoking the above-described will. ORS 114.130. Samuel died June 3, 1956, leaving a will which gave $3,000 to plaintiff, $3,000 to Jindra Bunn, and the remainder to Lillian. The will was admitted to probate with Lillian as executrix, and the appraised value was slightly in excess of $41,000.

Plaintiff's complaint in the case on appeal was filed February 25, 1957, and her amended complaint, on July 15, 1957. Plaintiff based her case on an alleged oral contract between Samuel and Emma, whereby each was to leave all his or her respective property to the other if the other survived, but if the other did not survive, then to leave it all to plaintiff on the death of the survivor of the contracting parties. Plaintiff makes no claim that the contract

was based on any consideration for services to be rendered by plaintiff to either parent.

Defendants assign as error: (1) that the evidence was not sufficient to establish the claimed contract, and (2), that plaintiff was barred from prosecuting this suit because she had made an election by seeking to have the will of Samuel construed as making her the residuary legatee and devisee, which action was allegedly inconsistent with this suit.

■ The second assignment of error will be first decided. The complaint in equity to establish the contract and the petition to construe the will were each filed on February 25, 1957. In the latter proceeding plaintiff sought only to have the will construed to the effect that she was the residuary legatee and devisee. She did not thereby seek to void the will. By the present suit she is not seeking to void the will as such, but merely to render it subject to the terms of the alleged contract. The two proceedings appear consistent, but even if deemed inconsistent, her action in seeking a construction of the will amounts only to a mistake of remedy not precluding her from seeking to establish the contract. *Medford National Bank v. Blanchard,* 136 Or 467, 299 P 301.

Preliminary to considering the assignment of error that the evidence was not sufficient to establish the contract, it should be stated that the principle is recognized in *In re Burke's Estate,* 66 Or 252, 256, 134 P 11, that:

> "* * * Such an agreement is valid if performed by the making of such wills and the acceptance by the surviving party of the fruits of the agreement, but it is valid only as a contract, the performance of which by one party and acceptance by the other has taken it out of the statute of

frauds: 40 Cyc. 2117, 2118. It is no objection to the probate of a will that it violates such an agreement, or revokes a former will made in pursuance of it. While such former will is revoked as a will, it still stands as evidence of the contract."

At the trial plaintiff testified on direct examination as follows:

"Q (By Mr. Levin) Was that statement or a statement substantially similar ever repeated by her?

"A Yes, when it was repeated several times, and then at the time that we were married mother and dad both said we were leaving on our honeymoon and we were standing on the front steps just going to go into the car, and dad says, 'Remember our home is yours, Everything goes to you. You are all we have.'

"* * * * *

"Q Was there any discussion with your father at about this time?

"A Yes.

"Q About Albert's coming into the store?

"A Yes, there was.

"Q What was said by him?

"A Well, shortly after that, that was early in March, I believe, dad and mother were both over at the house and they were sitting in the living room and mother and dad both were talking with Albert and me both at the same time, and dad says, 'Well, you kids might as well come into the store. After all you might as well work too. We are leaving everything to you.'

"Q Now do you recall the occasion when these wills were executed?

"A We,—definitely.

"Q What do you recall about it?

"A Well, I recall that I was in the front part of the store.

"Q Was that when you were working in the store?

"A I was working in the store at the time. And I was in the front part of the store, it seems to me, waiting on a woman, showing her knives from a knife case, and mother called me to come in the back. She said, 'Blanche, when you finish, come back here. There is something that daddy wants to talk to you about.' So I went in the back of the store after I finished and mother said, 'Dad, tell Blanche how we made out the wills.' And then dad says, "Mother and I are taking care of our property in possession and we have agreed to leave everything to each other, and when we are gone it all goes to you.' Mother says, 'That's right, daddy.'

"Q Was there anything further said on that occasion?

"A Yes, mother said, it being timely to make her will, because she wasn't feeling well, and she felt the way she had made it was the correct way because of illness in case she says, 'We have to be hospitalized, why hospitals can eat everything up.' So she felt that she was protecting daddy too.

"* * * * *

"Q When did your mother die?
"A February 9, 1953.

"Q Was there any conversations that you recall by your father on that occasion or shortly thereafter relating to this subject?

"A Yes, coming home in the car from the cemetery my father says, 'Well, I don't expect to be here very long and you kids will, it will all be left to you kids.' And he said, 'I have even taken care of the lot now so that I know I will be laying next to mother.'

"Q By that he meant the cemetery lot?
"A Cemetery, yes. He had purchased two lots and he said that he was ready to go. In other words, that he had had everything taken care of for

himself. I said, 'Oh, daddy, you are just feeling blue now. You are going to stay here a long time.' And at that time he said that everything went to us kids. He had everything taken care of."

Albert Patecky, husband of plaintiff, testified that late in '47 or early in '48 when they and Samuel and Emma were present the following conversation took place:

"Q  Do you recall who was present?

"A  Yes, Blanche's mother and father and Blanche, and of course our child.

"Q  Your son, Kenneth?

"A  Yes.

"Q  And what was said on that occasion, to the best of your recollection?

"A  To the best of my recollection the discussion had been going on for quite a while about entering into the business, into the store, to help out, and what I recall was this: That mother had mentioned the fact that they both have earned and were well off and it was a good business and there was no reason why I couldn't come in and earn what they were going to leave us. In other words—

"Q  Now what gave rise to this conversation? Was it anything to do with any change of plans on your part?

"A  It was very, it was a very important occasion, because I had to make a decision whether I should give up the security I had built up at the Telephone Company.

"Q  You had been with them fifteen years, I think you said?

"A  Correct.

"Q  Who was it that made this statement that you mentioned, do you recall which one of them?

"A  Mother made the statement.

"Q That was Mrs. Emma A. Friend?

"A That's right.

"Q What did Mr. Samuel Friend say?

"A He, he says that, 'You needn't worry about your future, as far as that is concerned, you will be better off than any of the fellows working at the Telephone Company.'

"Q Now do you recall a subsequent discussion between your wife's parents regarding that, this matter?

"A Yes.

"Q And when was that?

"A Well, that was at the time that we were visiting over at the folks, it was right after supper, and—

"Q Now what year was that, do you recall?

"A That was either early '48 or late '47. I cannot recall the exact date.

"Q This was after you had ceased working in the store?

"A Yes.

"Q You did not work after the year 1944, is that correct?

"A Well, I did work in '46 and then some time in '47, part time.

"Q Well, now, reverting to this discussion in, you said later '48 or early '49, is that correct?

"A No, I mentioned '47 and, late '47 or early '48. I don't recall the exact date.

"Q Where was the occasion that—

"A It took place at the home of my father-in-law and mother.

"Q On 29th Street?

"A Correct.

"Q Do you recall what was said at that time?

"A Well, at that time what happened, Blanche brought up the problem of the folks making a loan or arranging a loan for Jindra.

"Q What was, who was present then when Blanche mentioned that?

"A The four of us, Mr. and Mrs. Friend, and Blanche and I.

"Q What was said after Blanche brought up the subject?

"A Well, here's the way, as I can recall, to the best of my knowledge, that mother says that Blanche needn't worry, that they were helping Jindra out now, that as far as their wills were made, everything went to her. They weren't leaving anything to Jindra.

"Q Everything went to her. Who was her?

"A Blanche. And I think Mr. Friend made a statement, 'You needn't fuss. There is nothing for us to fuss about.' Words to that effect."

Mrs. Newman, sister of Emma, testified that on the day of and following Emma's funeral she and another sister, Mrs. Jermanis, were at Samuel's house, and during their conversation with him Samuel said:

"A Well, he says he has got everything fixed up, that there is nothing will be left behind after he is gone, then it goes to Blanche."

Mrs. Stecklein, a niece of Emma, testified concerning a conversation taking place with Samuel at his home during the 1944-45 holiday season when she and her husband and Samuel and Emma were present, as follows:

"A My husband and I were both at the table with my aunt and uncle.

"Q Was there anybody else at the table?

"A No. We are all the heaviest ones and we are the biggest eaters and we are always there last; and everybody was doing something else, congregated in the living room.

"Q What was said then by either Mr. or Mrs. Friend?

"A Well, we were talking about the end of the year how—what we had accomplished and we summed up everything, and in summing it up I had said that my little stepson, we were happy that he had overcome stuttering, and another thing, I got the deed to the lot next to my parents, the same as Blanche, and also that aunt—my Aunt Emma, I will call her—she was awfully proud that she had taken care of their will, and they decided to get it through.

"Q Now instead of referring to what she said, state to the best of your knowledge what she said.

"A She did say that daddy and I were happy that they had decided to get it done this year; they accomplished that much and they won't have to worry about Blanche; they had it all decided on and they had set back and they were holding hands and he said, 'Yes, mother, now we won't have to worry. We have been putting that off every year.'

"Q And was that the end of the conversation with reference to that matter?

"A Well, no. They mentioned it off and on. You mean at that time?

"Q At that time.

"A Yes. The rest of them came around and we all talked again."

Mrs. Jermanis, sister of Emma, testified concerning the conversation referred to by Mrs. Newman as follows:

"Q Will you state what Mr. Friend said on that occasion about his will and his disposition of his property.

"A Well, he said, 'Now I got everything fixed up; I got a place to go and—'

"Q (Interposing) What did he mean, 'a place to go'?

"A Referring to the plot.

"Q Cemetery plot?
"A Yes.

"Q And what else did he say?
"A And so I asked him, 'Have you got your will, too?' You know.

"Q And what did he say?
"A And he says, 'Oh, yes, I got that a long time ago'.

"Q Did he say anything further about it?
"A Yes. And he was talking and then he was talking about the will some more. Then he says, 'Well, the way we got the will fixed, if I go first then Emma gets it and, of course, as it is, of course, if Emma went first, so it goes to me. When I am done' he said, 'why, then it goes to Blanche'."

■ The foregoing evidence was objected to by defendants as being hearsay. The trial court properly admitted it as being within the purview of ORS 41.850. The trial court expressly disregarded evidence of statements made by Emma out of the presence of Samuel.

The defense called but one witness, being Earl F. G. Hurlburt, the attorney who drew the will of Samuel which is in probate. He testified that Samuel told him he had no other will.

■ The foregoing evidence, together with the evidence of the mutual and reciprocal wills by Samuel and Emma, is deemed sufficient to establish the making of the oral contract contended for by plaintiff. Mutual and reciprocal wills by a husband and wife do not necessarily establish they have acted pursuant to any agreement, but may be considered in determining whether in fact they were executed pursuant to a

contract. *Taylor v. Wait,* 140 Or 680, 684, 14 P2d 283. This case also holds that a promise to make a will is consideration for a promise to make a will in return.

■ The contract having been established, it remains to determine its effect on the rights of Lillian as the widow of Samuel. There is no evidence that Lillian, prior to Samuel's death, had knowledge of the contract between Samuel and Emma, nor of their wills, and it is assumed she was until then in ignorance thereof. None of the Oregon cases cited relative to the effect of contracts to make mutual and reciprocal wills in a certain manner involved the rights of a spouse by a later marriage to the survivor of the two contracting parties. Specific performance of a contract is not a matter of right in equity, but is more a matter of grace resting in the sound discretion of the court, controlled by equitable principles. *Wagner v. Savage, as Adm'r,* 195 Or 128, 149, 244 P 161; and *Perez v. Potier,* 179 Or 123, 150, 170 P2d 343. The cases in other jurisdictions cover many phases and variations of the general question. *Baker v. Syfritt,* 147 Iowa 49, 125 NW 998, took the extreme view that a husband contracting with his wife to dispose of their property in a certain way thereby parted with any heritable interest. As a consequence, his surviving wife of a later marriage could take nothing, and the decision further stated that the same rule would apply to a child, if any, of the latter marriage. However, there the contract was contained in a joint will which was probated following the death of the first wife, and the second wife thereby had at least constructive notice prior to her marriage.

*Bedal v. Johnson,* 37 Idaho 359, 218 P 641, went further in the other direction by holding such a con-

tract void as to a subsequent wife of the contracting husband who had no knowledge of the contract prior to her marriage. The view taken was that under such circumstances the contract was against public policy.

*In re Arland's Estate,* 131 Wash 297, 230 P 157, appears to be a leading case, often cited. In 1911 Charles and Mary Arland, husband and wife, made a written agreement concerning all their property belonging to the community. Pursuant thereto, each executed to the other a warranty deed to all the property, and the contract provided that such deeds should have the effect of vesting the survivor with the entire title. The deeds were placed in escrow. They further agreed that the survivor would immediately on the death of the other make a will giving all property to the children of the parties. Mrs. Arland died within a year, and Mr. Arland obtained from escrow the deed to himself. About four years later he remarried and lived about another six years. He did not make the will as agreed with his first wife, but did leave a will giving his second wife a one-third interest in his estate, with the remainder to his children by the first wife. Before her husband's death the second wife had no knowledge of the written agreement. The trial court upheld the terms of the will, and this was affirmed on appeal, where the Supreme Court stated:

"This case rests entirely upon equitable principles. The court is free to do that which its conscience dictates. * * *

" 'We think the true rule and the one which best harmonizes with the broad principles of equity, is that specific performance will be denied when rights of innocent third parties have intervened so that enforcement of the contract would be harsh, oppressive, or unjust to them.' "

*Owens v. McNalley,* 113 Cal 444, 45 P 710, cited in the Arland case but not identical as to facts, is applicable. McNalley, a bachelor, orally contracted with a niece to come to California and care for him, in return for which he would leave her all his property. She had performed for about 12 years when McNalley married. At his death he left a will giving his property to his wife. The wife had no knowledge of the contract until after her husband's death. The appellate court affirmed the trial court in denying relief to the niece in a suit for specific performance and said in part:

"* * * She [the widow] acquired distinct rights of heirship and succession. * * * It is true this right vested after the contract was made, but where a bill is brought for specific performance of a contract the after-acquired rights of third parties are equitable considerations to be regarded in adjudicating the questions. * * *

"* * * * * *

"Specific performance * * * is not to be decreed under strict rule and formula. * * * and it will be decreed only when no other adequate relief is available to plaintiff, and even then will be denied if it operates as a hardship upon the innocent."

We are faced with the question of whether the court can enforce the contract in part—that is, under the situation in this case by compelling a conveyance and transfer from the estate to plaintiff of all property not accruing to the widow by virtue of the statute.

The general rule is stated in *Public Market Co. v. Portland,* 160 Or 155, 162, 83 P2d 440, to be:

"It is an established principle of law that a contract must be performed in its entirety if performed at all under compulsion of a court of equity * * * *."

There are exceptions to the general rule apparently intended for the benefit of the party seeking the relief. Oregon recognizes that a purchaser of land may take less than the quantity bargained for. *Bartholomew v. Bason,* 188 Or 550, 214 P2d 352. Volume 2, Restatement of Contracts 638, § 359(2), states that the decree need not be absolute in form and the performance that it requires need not be identical with that promised in the contract; it may be drawn so as to best effectuate the purposes for which the contract was made, and it may be granted on such terms and conditions as justice requires. See 81 CJS 446, Specific Performance § 21, to the same effect. Marriage being a natural and desirable relationship in the eyes of the law, it may be said that the possibility of remarriage of either Samuel or Emma was within their contemplation when the contract was made and became a part thereof. At least, it may not be assumed that they intended an agreement in restraint of marriage.

It may be assumed that plaintiff would prefer to take from the estate a part of the property contracted for than to take none. If relegated to an action for damages for breach of contract, her recovery would likewise be subject to the widow's statutory benefits.

Under the circumstances revealed by the evidence it is deemed equitable to allow Lillian Friend only the rights reserved to her by statute as widow of the deceased and to allow plaintiff the remainder of the estate property in pursuance to the contract. Plaintiff did not pray for partial performance of the contract if full performance could not be had, but the equity court can nevertheless so provide. *Caveny v. Asheim et al,* 202 Or 195, 221, 274 P2d 281.

Defendant Jindra Bunn cannot take under the will. She had no rights distinct from the will, and plain-

tiff's rights under the contract take precedence so far as Jindra is concerned. Lillian Friend, as executrix, was duty bound to defend on trial and on appeal and she should be allowed attorney's fees and disbursements from the estate for such defense.

Under the law and the equities existing it is deemed that the decree in the circuit court is modified as follows:

(1) To allow defendant Lillian Friend the sustenance and support out of the estate as authorized by ORS 113.070 and ORS 116.015;

(2) To set aside to Lillian all the property of the estate exempt from execution pursuant to ORS 116.010; provided that she is permitted to elect whether to receive the homestead exemption or to have dower in the homestead property;

(3) To allow her dower in any real property other than the homestead as provided by ORS 113.010;

(4) To allow her out of the estate funds a reasonable attorney fee for defending this suit in the trial court and on appeal, together with her necessary disbursements on trial and on appeal.

Affirmed as modified.