Argued and submitted May 14, reversed and remanded in part; otherwise affirmed
on appeal and cross-appeal October 13, 1999

In the Matter of the Estate of
James Leonard Sheldon, Deceased.

Diana L. SHELDON,
*Appellant,*

*v.*

James Lee SHELDON,
Personal Representative of the Estate of
James Leonard Sheldon, Deceased,
*Respondent.*

Diana L. SHELDON,
*Appellant - Cross-Respondent,*

*v.*

James L. SHELDON,
Personal Representative of the Estate of
James Leonard Sheldon, Deceased,
*Respondent - Cross-Appellant.*

(97P0060; CA A102979)

987 P2d 1229

William V. Deatherage argued the cause for appellant. With him on the briefs was Frohnmayer, Deatherage, Pratt, Jamieson, Clarke & Moore, P. C.

David B. Paradis argued the cause for respondent. With him on the brief were Thaddeus G. Pauck, and Brophy, Mills, Schmor, Gerking & Brophy, LLP.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

These appeals arise from a judgment granting declaratory relief on a claim under ORS 28.040 brought by the personal representative of decedent's estate and on a foreclosure claim made by decedent's widow, Diana Sheldon. ORS 115.155. The trial court consolidated the two cases and entered a declaratory judgment from which both parties appeal. ORS 28.070. We review for errors of law, and, because this declaratory judgment proceeding is in the nature of a suit in equity, we try all factual issues *de novo*, except where indicated. ORS 19.415(3). We reverse, in part, on appeal and affirm on cross-appeal.

Decedent entered into a "joint mutual and reciprocal will contract" with his second wife, Billie Sheldon, in 1990.[1] In that agreement, they promised to leave their respective estates to the surviving spouse, who would then distribute the estate equally to their six children (each had three children from prior marriages). Billie died in 1992, and decedent received the proceeds of her estate, including a house in Mexico.

Decedent married Diana in November 1995. At the time of the marriage, decedent owned a house in Grants Pass and a lot in Florence, in addition to the house in Mexico. He had stocks and bonds in his own name and maintained a separate bank account (the pro golf account). After the marriage, decedent and Diana maintained a joint checking account in addition to their respective bank accounts. The couple also obtained two loans: the first to refinance the Florence lot and the second to refinance and remodel the Grants Pass house.

Apparently, decedent and Diana met with an attorney regarding their estate plans in July 1996 after decedent was diagnosed with cancer. Decedent, following the advice of the attorney, executed a will in order to honor the agreement with Billie whereby personal property that he had acquired after Billie's death was bequeathed to Diana and the remainder of his estate was bequeathed to the six children upon his

---

[1] Hereafter, for convenience, we will refer to Diana Sheldon and Billie Sheldon by their first names.

death. He also executed a promissory note to Diana in the amount of $90,000.

In August 1996, decedent sold the Mexico house for $100,000 and deposited the proceeds into the pro golf account. That same month, two deposits of $10,000 each were made to decedent and Diana's joint checking account from the pro golf account. At the time of decedent's death in January 1997, there was a balance of approximately $20,000 in the joint account.[2]

After the probate of decedent's estate was commenced, Diana filed an election against the will, seeking her statutory elective share of the estate under ORS 114.105.[3] She also filed a claim against the estate on the $90,000 note. The personal representative denied both claims, which led to this litigation and, eventually, to the following judgment:

"1.   Diana Sheldon is not entitled to receive an elective share of the estate of [decedent].

"2.   The estate of [decedent] will pay the balance of the loan in the original principal amount of $88,000 owing to Evergreen Federal Bank.

---

[2] That amount does not take into account $26,700 that Diana paid to the estate from the joint account. That sum had been deposited by decedent from one of his stock accounts shortly before he died.

[3] ORS 114.105 provides, in part:

"(1) If a decedent is domiciled in this state at the time of death and dies testate, the surviving spouse of the decedent has a right to elect to take the share provided by this section. The elective share consists of one-fourth of the value of the net estate of the decedent, but the elective share shall be reduced by the value of the following property given to the surviving spouse under the will of the decedent:

"(a)  Property given outright;

"(b)  The present value of legal life estates; and

"(c)  The present value of the right of the surviving spouse to income or an annuity, or a right of withdrawal, from any property transferred in trust by the will that is capable of valuation with reasonable certainty without regard to the powers forfeited under subsection (2) of this section.

"(2) Except as to property applied under subsection (1) of this section to reduce the elective share, an election to take under this section forfeits any other right to take under the will and under the law of intestate succession.
* * *

"(3) The right to elect may be barred under ORS 114.115, the share limited by ORS 114.125 or the right denied or the share reduced under ORS 114.135."

"3.  Diana Sheldon is not entitled to payment of the $90,000 promissory note * * * and * * * is not entitled to foreclose the trust deed * * *. Said note will be satisfied and said deed of trust will be reconveyed on the sale of the property described therein upon the estate's payment of the loan owing to Evergreen Federal.

"4.  The estate is not entitled to the funds in the amount of approximately $20,000 currently held by Diana Sheldon, that were in [decedent] and Diana L. Sheldon's joint checking account * * * at the date of [decedent's] death, and Diana Sheldon is entitled to keep these funds.

"5.  James L. Sheldon as personal representative of the estate of [decedent], is entitled to recover attorneys fees incurred in defending Diana L. Sheldon's foreclosure action.

"6.  James L. Sheldon as personal representative of the estate of [decedent] is entitled to recover cost disbursements and prevailing fees incurred in these cases."[4]

On appeal, Diana assigns error to the trial court's determination that she is not entitled to an elective share. She argues that the evidence does not support the trial court's finding that she had waived her elective share and, further, that denying her election would be against public policy. In response, the personal representative makes three arguments: first, that equitable principles preclude the elective share under the facts of this case; second, that Diana waived her right to elect under the applicable statute; and, third, that even if the elective share statute applies, there is nothing for her to claim because the estate will be depleted as a result of the performance of the agreement with Billie.

ORS 114.105 provides that the surviving spouse of the decedent has a right to elect to take a one-fourth share of the value of the net estate reduced by the value of certain property. Section three of that statute provides that other statutes may limit, deny or bar the exercise of that right under particular circumstances. One of those statutes, ORS 114.115, provides:

---

[4] The trial court also entered a supplemental judgment awarding attorney fees and costs.

"The right of the surviving spouse to elect under ORS 114.105 may be barred by the terms of a written agreement signed by both spouses. The agreement may be entered into before or after marriage."

There is no evidence of a written agreement executed by Diana and decedent barring her from making an election under the statute.

■ Nonetheless, the personal representative argues that the holding in *Patecky v. Friend et al*, 220 Or 612, 350 P2d 170 (1960), operates to deprive Diana of her elective share as a matter of law. The personal representative asserts that *Patecky* stands for the rule that "[a] wife seeking to enforce statutory rights loses if she had notice of the contractual obligation before the marriage." We disagree with that characterization of the holding in *Patecky*.

In *Patecky*, there was no evidence that the widow knew of the contract between the decedent and his prior wife before the decedent's death. 220 Or at 624. The decedent did not meet his contractual obligation to his previous spouse to leave their property to their daughter. Instead, his will gave a specific sum to the daughter and to a third person, with the remainder going to his widow. *Id.* at 615. The daughter sought the entire estate pursuant to the contract. However, the court enforced the contract *subject to the widow's statutory benefits*. *Id.* at 626-28. It noted: "Specific performance of a contract is not a matter of right in equity, but is more a matter of grace resting in the sound discretion of the court, controlled by equitable principles." *Id.* at 624. Our understanding of the import of the holding in *Patecky* on this case is that Diana's knowledge of decedent's contract with Billie is merely one factor to consider in deciding whether to give effect to the election.

■ The personal representative also relies on the following findings made by the trial court in a letter memorandum incorporated by reference into the judgment:

"1) Diana Sheldon knew before her marriage to [decedent] that all previously acquired assets of [decedent] and Billie Sheldon's estate were to go to their children through the reciprocal wills. This was discussed with

Diana Sheldon before [decedent's] death and before the wills made by Diana and [decedent] in 1996.

"2) Diana Sheldon discussed the provisions of Billie and [decedent's] reciprocal wills with [decedent] and with [decedent's attorney]. Diana orally agreed that those provisions were an obligation of [decedent], that he should abide by the provisions and that she agreed to such.

"3) [Decedent's attorney] explained Diana's elective share to [decedent] and [decedent] relied on Diana's representations that the will drafted by [decedent's attorney] would be fine with her. [Decedent] and Diana's wills are written confirmation of Diana and [decedents'] agreement that the prior reciprocal wills be honored."

In *Patecky*, the court focused on the relationship between the parties and the obligations that arose out of those relationships as well as the impact of statutory provisions intended to provide for the support of the surviving spouse on those relationships and obligations. Diana, like the widow in *Patecky*, was not a party to the contract with Billie. Moreover, it is clear that she acted with the intent to honor decedent's agreement with Billie. For instance, she reconveyed to decedent the portion of her interest in the Grants Pass house after their attorney advised them that decedent's initial conveyance of that interest to her breached his contractual obligations to the children. This is not a case where Diana comes into court with unclean hands such that equity would bar her from electing against the will on that ground. We turn to the issue of waiver.

The present probate code was enacted in 1969, and the portions relevant to this case have not been affected by subsequent amendments. *See* Oregon Laws 1969, chapter 591. The right of a surviving spouse to an elective share under ORS 114.105 has historical connections to common law and statutory rights to dower or curtsey. *See, e.g.,* General Laws of Oregon, ch 17, pp 583-88 (Deady 1845-1864). Then, as now, particular circumstances could bar a surviving spouse from exercising a statutory right to a portion of the deceased spouse's estate. Accordingly, courts have recognized

that public policy is not adverse to a surviving spouse "waiving" a right to take under the statute or subjecting that right to a contract. *See, e.g., Moore v. Schemerhorn*, 210 Or 23, 38-39, 307 P2d 483, 308 P2d 180 (1957). On the other hand, the right to an elective share under the statute expresses an important public policy promulgated by the legislature that cannot be lightly disregarded.

■       On the issue of waiver, we review the trial court's findings for sufficiency of the evidence and its legal conclusions for errors of law. *See Marshall v. Burcham*, 116 Or App 476, 479, 841 P2d 688 (1992) (holding that "[i]n an equitable action, affirmative defenses that are legal in nature are reviewed as in an action at law."). It appears that the trial court found a waiver based on its findings that "Diana orally agreed that those provisions [of decedent's will] were an obligation of [decedent], that he should abide by the provisions" and that "[decedent] relied on Diana's representations that the will drafted by [decedent's attorney] would be fine with her." In regard to whether those findings are supported by the evidence, the personal representative makes only general references to the record. In our own review of the record, we find that only the following excerpts from Diana's testimony and that of the attorney that they consulted could support the trial court's findings. Diana testified:

"Q.   And you knew that Jim Sheldon executed a will that provided you with some household furnishings, and what not, and then the rest of his estate went to his three children and Billie's three children, correct?

"A.   Correct.

"Q.   And at that time that was satisfactory to you, that arrangement?

"A.   Yes."

The attorney testified that he had explained to decedent and Diana that decedent had certain obligations arising from the agreement with Billie. This exchange followed that testimony:

"Q.   And did Ms. Diana Sheldon have any objections to that?

"A. Well, no.

"[The attorney then described Diana and decedent's respective wills in response to questions by the personal representative's attorney.]

"Q. And did Ms. Sheldon indicate that she had any objection or problem with that estate plan, if you will?

"A. Well, she didn't have any problem with the estate plan that Mr. Sheldon and I had discussed, which also took into consideration providing for her contribution, no."

■ The question is whether that testimony is sufficient to support the trial court's findings and to meet the requirements needed for the conclusion that Diana waived her right to elect. The waiver of a statutory right is an "intentional relinquishment or abandonment of a known right or privilege." *Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or 235, 240, 855 P2d 626 (1993). "To make out a case of waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part." *McMillan v. Montgomery et al.*, 121 Or 28, 32, 253 P 879 (1927). It is not clear from the context of the above testimony that, in agreeing that decedent should perform his obligation under the agreement with Billie, Diana also agreed to waive her elective share. The record is also consistent with the inference that, at the time of the purported waiver, Diana intended to acknowledge the contract but reserved with her silence the right to elect against the will. Under the circumstances, we conclude that there is insufficient evidence for the personal representative to have carried his burden of demonstrating a clear and unequivocal intent by Diana to waive her right to elect under ORS 114.105.

The personal representative's final argument concerning the elective share is that, "even if the elective share statute applies, Diana Sheldon's share is subject to [decedent's] contractual obligations." At oral argument, the personal representative abandoned the argument that the contractual obligations constituted a claim under ORS 111.005(7) and (23) that would reduce the net estate from which the elective share would be calculated. *See Willbanks v. Goodwin*, 70 Or App 425, 432, 689 P2d 1004 (1984), *rev'd*

*on other grounds* 300 Or 181 (1985). However, he continues to assert that the estate holds Billie's estate in constructive trust for the benefit of the children and that it is not part of decedent's estate for purposes of an election.

■ ■    A constructive trust will be imposed by a court against one who by wrongful conduct has obtained or holds legal right to property which he ought not to enjoy in good conscience and equity. *Marston v. Myers et ux*, 217 Or 498, 509-11, 342 P2d 1111 (1959). Thus, the personal representative's argument necessarily presupposes that decedent's estate or Diana have held or hold Billie's or the children's interests wrongfully. However, decedent's obligations under the reciprocal will agreement with Billie were limited to "not to revoke, amend, or otherwise change the provisions of his * * * will in any way whatsoever [that] affect[s] the dispositive provisions for the children of the deceased spouse." Decedent fulfilled his obligations under the agreement, and the personal representative has not demonstrated that decedent or Diana acted in any other manner that would permit a court to impose a constructive trust on estate property except for Diana's election. Because that act is expressly permitted by the legislature under ORS 114.105, we conclude that it does not provide the basis for the imposition of a constructive trust.

■    Second, Diana assigns error to the trial court's ruling that she is not entitled to payment on the $90,000 promissory note and to foreclose on the trust deed on the Grants Pass house that secures the note. Apparently, that ruling is tied to the trial court's determination that the estate is to pay the loan amount owed to the bank. The record indicates that the estate has since paid the loan in full.[5] If the note was intended as security in the event that the loan was not paid, then it would no longer have efficacy. Nonetheless, Diana

---

[5] In fact, the estate paid off both the loan taken out to refinance and remodel the Grants Pass house and the loan used to refinance the Florence lot. Diana had signed for both of those loans. The trust deed refers only to the Grants Pass property so we refer to that loan when discussing the promissory note. Whether the note covered Diana's obligations on both loans is immaterial, as both have been satisfied by the estate.

argues on appeal that her assumption of the potential liability for the loan provided consideration in exchange for which decedent agreed to pay her $90,000.

At trial, Diana testified that it was her understanding that the promissory note was meant to protect her from the loan obligation and was to be enforced in the event that decedent did not pay off the loan. She also testified that she had never loaned decedent $90,000 and had not used any of her money to repay the bank loan. Decedent's attorney testified that:

> "The note and trust deed was to give her security as far as her obligation. Now it's my understanding in our discussions that he felt that there was an additional contribution in the fact that she had signed this note to the lending institution, if there was something over and above that. And in fact in reviewing and recalling the situation, he did not have the information at that time to provide the accurate amount that he felt was the obligation that he in effect would owe to her, and so we had left blank the amount of the note and he was going to go back * * * to check records to determine exactly what the amount he felt was that he was obligated."

We agree with the trial court that the note was given by decedent to Diana as security to protect her from any financial hardship or obligation under the loan agreement. Accordingly, she is not entitled to collect on the note or to foreclose on the trust deed as the note has been fully satisfied by the estate's payment of the loan.

■ Diana also assigns error to the trial court's ruling that the estate was entitled to reasonable attorney fees for its defense of her claims on the note and for foreclosure of the trust deed. However, the estate has prevailed on that claim and under the terms of the promissory note is entitled to recover attorney fees. ORS 20.096; *Riccardi v. Frink*, 133 Or App 436, 442-47, 891 P2d 1336, *rev den* 321 Or 268 (1995).

■ Finally, the personal representative assigns error on cross-appeal to the trial court's ruling that funds in the joint checking account belong to Diana. In August 1996, decedent sold the Mexico house for $100,000 and deposited the money into the pro golf account. No one disputes that those proceeds

belong to the estate and are subject to decedent's obligations under his agreement with Billie. At issue are the two deposits of $10,000 each that were made that same month to the joint checking account from the pro golf account. The personal representative argues that those deposits can be traced from the sale of the Mexico house and were in the joint account at the time of decedent's death in January 1997. Diana testified that those deposits became commingled with other funds and cannot be traced. She relies on ORS 708A.470(1), which provides, in part:

"Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent, unless there is clear and convincing evidence of a different intention in the bank's account records at the time of death."

As we have said, equity authorizes a court to grant relief to intended beneficiaries under a will contract by imposing a constructive trust on property in the hands of a third party. In this case, it is arguable that a constructive trust could be imposed on the proceeds from the sale of the Mexico house if those proceeds can be identified in the joint account. *See, e.g., Ferchen v. Arndt*, 26 Or 121, 126-31, 37 P 161 (1894); *Kassahn v. Kassahn*, 126 Or App 158, 162, 868 P2d 9 (1994). But, as the court explained in *Ferchen*:

"But, [when] such [beneficiary of the trust] seeks to recover specific property, or to create a lien upon a mass or fund, he must trace such property, and show that it belongs to him, or that it has gone into and then remains in the mass which he seeks to impress with a lien or charge. In such cases the question to be determined always is whether the trust property or fund, or the proceeds thereof, is traceable into any specific property or fund. Before, therefore, one claiming to be a trust creditor can be entitled to a lien or preference over other creditors, he must make it appear that the fund or property of the debtor which he seeks to affect with such lien or preference includes the trust property, or the proceeds thereof.

"* * * Hence, so long as the trust property can be traced and followed into the hands of the debtor, his estate is subject to the trust; but when it has been dissipated, and is no longer traceable, there remains nothing to be the subject of the trust and the equitable right of the *cestui que trust* to follow it fails. 'When trust money,' said Allen, J., 'becomes so

mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property, the trust ceases. The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the *cestui que trust* to follow it fails.['] *Little v. Chadwick*, 151 Mass. 109, 23 N.E. 1005 [1890]." 26 Or at 128-29.

The record indicates that decedent had income ranging from $2,000 to $4,000 per month that was deposited into the pro golf account during the months before his death. In addition, Diana testified that joint tax returns and funds from the sale of a vehicle were deposited into the joint account before decedent's death. The joint account statements reflect an approximate $40,000 balance in April 1996, a $5,000 deposit in July, deposits of $20,000 in August, deposits of more than $13,000 in October and deposits of almost $1,800 in November of that year. Therefore, it is inferable from those facts that the $20,000 that was in the account in January 1997 came from sources other than from the proceeds of the sale of the house in Mexico. Under the circumstances, we are not persuaded that the personal representative has carried his burden of proof. The trial court did not err in ruling that the remainder of the joint account passed to Diana by right of survivorship.

The declaration that Diana Sheldon is not entitled to an elective share is reversed and remanded to enter a declaration that she is entitled to an elective share; otherwise affirmed on appeal and cross-appeal.