Argued July 10, affirmed as modified September 10, 1973

# PORTLAND SECTION OF THE COUNCIL OF JEWISH WOMEN, *Respondent, v.* SISTERS OF CHARITY OF PROVIDENCE IN OREGON, *Appellant.*

513 P2d 1183

450

*Curtis W. Cutsforth,* Portland, argued the cause for appellant. With him on the briefs were Frank E. Nash, and Miller, Anderson, Nash, Yerke & Wiener, Portland.

*Garry L. Kahn,* Portland, argued the cause for respondent. With him on the brief were Pozzi, Wilson &

Atchison, Howard M. Feuerstein, and Davies, Biggs, Strayer, Stoel & Boley, Portland.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, HOWELL, and BRYSON, Justices.

HOLMAN, J.

Plaintiff is a charitable corporation organized by Jewish women. Defendant is a charitable corporation which operates the St. Vincent Hospital and Medical Center and is the successor in interest to the Sisters of Charity of Providence of St. Vincent's Hospital. Plaintiff brought this suit to require defendant to perform a contract allegedly made in 1927 between plaintiff and defendant's predecessor which required the hospital, in return for the payment of $5,000, to furnish ward accommodations and services in perpetuity to one person at a time, such person to be designated by plaintiff. Defendant appeals from the trial court's decree specifically enforcing the agreement.

The first question raised by the appeal is whether there was such a contract with defendant's predecessor. The evidence convinces us there was. No signed contract was found by either party. However, unsigned copies of two contracts were found, one dated February 1927 and the other dated March 16, 1927. The two documents were identical except for some minor matters with which we are not directly concerned. Defendant's records disclose an Annual Account of the Financial Archives, under date of December 31, 1958, which has the following entry:

"Received: $5,000 March 16, 1927, and additional $500.00 April 13, 1945. Obligation in per-

petuity with Council of Jewish Women for maintenance of free ward bed for Jewish patients."

Opposite the entry is the following notation:

"This obligation is faithfully carried out, according to the terms of the agreement."

In addition, defendant's records disclose a journal which lists the names of patients whose charges were written off by St. Vincent's Hospital to the "Jewish Endowed Bed." The first page of the journal is headed,

"Jewish Endowed Bed 3/16/27."

In addition, other correspondence and documentation were adduced tending to show that there was an agreement to give care to Jewish patients designated by plaintiff.

Defendant makes the argument that, even if some sort of an agreement did exist, there is no evidence of the specific terms of the agreement. We conclude, as the trial judge did, that the unsigned agreement of March 16, 1927, contained the terms of the agreement. It is obvious there was some agreement, and we believe it is not a mere coincidence that the date of the last contract, the date of the payment of the money, and the date at which defendant commenced its journal covering the patients whose charges were written off to the "Jewish Endowed Bed" are the same.

■ Defendant contends the statute of frauds prevents the agreement from being enforced because there was no writing signed by its predecessor. The payment of the full consideration by plaintiff and the money's acceptance and retention constitute such per-

formance of the contract sufficient to take the agreement out of the statute of frauds. *Stevens v. Good Samaritan Hospital and Medical Ctr.,* 264 Or 200, 504 P2d 749 (1972); *Luckey v. Deatsman,* 217 Or 628, 632-33, 343 P2d 723 (1959); *Howland v. Iron Fireman Mfg. Co.,* 188 Or 230, 308-09, 213 P2d 177, 215 P2d 380 (1950). Defendant argues that the performance is not exclusively referable to the contract of March 16, 1927. As previously indicated, the records of the defendant show that it is so referable.

■ Defendant was incorporated in 1934. The agreement was entered into by its predecessor, the Sisters of Charity of Providence of St. Vincent's Hospital. Since there was no written assumption of the contract by defendant upon defendant's incorporation in 1934, defendant contends that it cannot be required to render specific performance. The evidence indicates that the reason for the reincorporation was a technical limitation on the amount of assets which could be held by the old corporation. After the reincorporation, defendant took over the operation of the hospital and all assets connected therewith including whatever remained of plaintiff's $5,000 or whatever assets were purchased with it. Since the reincorporation was only a technical matter and was for the purpose of uninterruptedly carrying on the business of the old corporation, and since defendant took over all of its predecessor's assets and continued to honor the agreement, defendant is liable on the contract to the same extent as was its predecessor.

In 15 Fletcher, Cyclopedia of Corporations § 7329, at 633-34 (rev. vol. 1961) it is stated:

"* * * [W]here a company is merely reincorporated, the new company is liable for the debts

of the old, as where it is formed for the purpose and with the intent of carrying on the business originally planned and intended to be carried on by the old corporation. * * *." (Footnotes omitted.)

*Cf. Diamond Fruit Growers, Inc. v. Goe Co.,* 242 Or 397, 409 P2d 909 (1966); *Dairy Co-Operative Ass'n. v. Brandes Creamery,* 147 Or 488, 496-97, 30 P2d 338 (1934).

Defendant also contends the suit is barred by laches. This suit was initiated in August 1971. The evidence shows that plaintiff used the services of defendant's hospital on a fairly regular basis, but to a gradually lessening extent, through 1959. Since that time no patient has been admitted under the agreement. There was a written request made by plaintiff in 1970 and a written refusal by defendant. At some point between September 1, 1966, and 1970 there had been a telephone request and an oral refusal. There is some evidence that there had been other oral refusals between 1964 and 1966, but the specific circumstances of the refusals were not known to the witness nor was there any written evidence of them.

Defendant's contention, essentially, is that since the suit was not begun within six years of the first refusal, the applicable statute of limitations on an action at law would have run and, therefore, in equity prejudice to defendant is presumed from the delay, and the burden is upon plaintiff to show that such is not the case. *McIver v. Norman,* 187 Or 516, 545-46, 205 P2d 137, 213 P2d 144 (1949).

■■ Before delay is a bar in equity, it must result in prejudice to another. *McIver, supra* at 524. The only way in which prejudice could have resulted from

the delay in this case is by the disappearance of evidence tending to prove there was no contract. Otherwise, the delay could only have benefited defendant by its being saved the expense it would have incurred in carrying out the agreement had enforcement of the contract been attempted sooner. It is extremely difficult in a case of this kind for plaintiff to prove now that, had the suit been brought sooner, no other evidence would then have been found to be in existence which would have been helpful to defendant. However, in view of the evidence that has been introduced, the original existence of such other evidence seems extremely unlikely. The evidence which most surely demonstrates the existence of the agreement is solely documentary and comes from the records of defendant. To presume that, had plaintiff brought its suit sooner, there would have then been evidence available to defendant which would have contradicted its presently available records seems absurd. We hold that the proof sufficiently demonstrated there was very little likelihood of prejudice to defendant due to delay.

Defendant's principal defense against specific enforcement of this agreement is that it would work an undue hardship on defendant and on those members of the community using the hospital's services, such hardship being due to the present vastly inflated costs of medical care as compared with the costs of such care when the agreement was made. There is evidence that many new and expensive medical and hospital techniques have been developed which, together with inflation, have increased the cost of defendant's per patient care from a few dollars a day to approximately $140 per day, if all services are utilized.

■■ The problem, though unstated by the parties,

is due to the perpetual nature of the agreement① and to the inherent risks assumed by the promisor under such an agreement. Although perpetual agreements are disfavored, where clearly provided for they will be enforced according to their terms. *See Zimco Restaurants v. Local 340, Bartenders and Culinary Workers Union*, 165 Cal App 2d 235, 331 P2d 789, 792 (1958). *Cf. Borough of West Caldwell v. Borough of Caldwell*, 26 NJ 9, 138 A2d 402, 412-13 (1958); *Freeport Sulphur Co. v. Aetna Life Insurance Co.*, 206 F2d 5, 8, 41 ALR2d 762 (5th Cir 1953). All the circumstances of each case must be considered in reaching a conclusion and, if consideration for the promise is fully executed, courts are reluctant to hold the promise terminable. 1 Williston, Contracts 112, § 38 (3d ed 1957).

Since the contract in this case is clearly perpetual by its terms, the question then becomes whether the defendant assumed the risk of such vastly inflated prices.

The law on the subject of impossibility or hardship is unclear since much of the area is a matter of discretion in enforcing a given contract. However, the modern trend appears to be to allow the defense in more cases than formerly, *see* 6 Corbin, Contracts 321, § 1320 (1962), though the most restrictive area is still hardship due to increased ex-

---

① "* * * first party hereby agrees to furnish ward accommodation in perpetuity to one man, woman or child at a time, such patients to be sent to the hospital of the first party by any reputable physician and with the authorization of the designated official of the second party. The ward accommodation so to be furnished as herein agreed shall include bed, board, care of general nurse, medicine including any anesthetic, when necessary, dressings, laboratory, use of surgery and x-ray. * * *."

pense. That is this case. The Restatement generally does not allow discharge. It states:

"Except to the extent required by the rules stated in §§ 455-466, facts existing when a bargain is made or occurring thereafter making performance of a promise more difficult or expensive than the parties anticipate, do not prevent a duty from arising or discharge a duty that has arisen." 2 Restatement, Contracts § 467 at 882 (1932).

Corbin's analysis of hardship as a reason for denying specific performance is found in 5A Corbin, Contracts 205, § 1162 (1964):

"* * * The remedy [of specific performance] should not be refused * * * merely because of the rise or fall of market values that is within the usual contemplation of contractors and the risk of which is usually intended to be assumed when the contract is made. Specific performance will not be refused merely because the contract turned out to be a losing one.

"Specific performance should seldom be refused on the ground of changed conditions if nothing has occurred since the making of the bargain that was not within the actual contemplation of the parties when they were bargaining. * * *." (Footnotes omitted.) 5A Corbin, Contracts § 1162, at 207-11.

See also 6 Corbin, Contracts 365, § 1333, at 365 (1962). What is foreseeable in a perpetual contract is difficult to ascertain especially since such contracts are rare.

▉▉▉ The law in Oregon on discharge for practical impossibility because of unexpected difficulty or expense is set out in *Savage v. Peter Kiewit Sons' Co.,* 249 Or 147, 432 P2d 519, 437 P2d 487 (1968). The court there stated:

"In applying the doctrine of impossibility, courts recognize that unexpected difficulty or ex-

pense may approach such an extreme that a practical impossibility exists. See, e.g., *Natus Corporation v. United States,* 371 F2d 450 (Ct. Cl. 1967). To operate as a discharge, however, the hardship must be so extreme as to be outside any reasonable contemplation of the parties. *Natus Corporation v. United States,* supra. And see Restatement of Contracts § 454 (1932); *Transatlantic Financing Corporation v. United States,* 363 F2d 312, 315 (DC Cir 1966).

"Unexpected difficulties and expense, therefore, whether caused by injunction or by other causes, do not necessarily excuse performance of a contract. The question is whether the unforeseen hazard was one that reasonably should have been guarded against. * * *." 249 Or at 152-53.

*Accord, Sachs v. Precision Products,* 257 Or 273, 281, 476 P2d 199 (1970); *Schafer v. Sunset Packing,* 256 Or 539, 542, 474 P2d 529 (1970). The cases and texts do not give any exact basis for decision. Subject to equitable principles, it remains in the discretion of this court whether to grant specific performance or not. *See Patecky v. Friend et al,* 220 Or 612, 350 P2d 170 (1960), where we stated:

"* * * Specific performance of a contract is not a matter of right in equity, but is more a matter of grace resting in the sound discretion of the court, controlled by equitable principles. *Wagner v. Savage, as Adm'r.,* 195 Or 128, 149, 244 P [2d] 161; and *Perez v. Potier,* 179 Or 123, 150, 170 P2d 343. * * *." 220 Or at 624.

■ We hold that the trial court was correct in decreeing specific performance of the agreement. Even in 1927 it must have been contemplated by the parties that there was a distinct possibility that costs would not remain stable. It was necessarily evident that hospital care was, as it is now, an evolving science in

which new treatments and techniques were being developed. Neither are we convinced that the contract presently is impossible of performance or so difficult to perform that equity should give relief therefrom. Defendant's gross receipts at the time of trial were at the rate of approximately $12,000,000 a year. We hold that the hazards of increasing expenses attributable to inflation and new techniques were ones that should and could have been guarded against and that the hardship has not become so extreme as to have been beyond any reasonable contemplation of the parties.

■ Since both parties to the suit are nonprofit, charitable organizations, the purpose of any contract for hospitalization between the two must logically be presumed to have been for the benefit of the needy. In carrying out their actions and by their performance of the contract the parties have so construed it.② It may well be that defendant, in recognition and execution of its philanthropic purposes, was willing to allow the Jewish section of the community to designate those Jews who would be the beneficiaries of defendant's charity if it would pay at least part of the cost of that charity, and that the $5,000 was never contemplated as being the equivalent of the value of the services such patients would ultimately be given.

Where the contract simply allocates risk and responsibility between two charitable organizations, contrary to the urging of defendant, there is probably no substantial net loss to the community from enforce-

---

② The following is an extract from plaintiff's Memorial and Happy Day Fund Report, dated May 4, 1927:

"* * * the bed is now an established fact and available to our sick poor at St. Vincent Hospital when applied for through the committee." (Emphasis added.)

ment. The expenses of care and benefits derived there-
from are merely being distributed through the com-
munity in a different way.

The decree of the trial court should be modi-
fied slightly to conform with what we believe was the
intent of the parties. The Jewish patients to whom
defendant is required to give care under the agree-
ment are limited to needy persons who are the legiti-
mate objects of charity.

The decree of the trial court is affirmed as modi-
fied. Costs on appeal will be allowed to neither party.