**BANCARD SERVICES, INC., and Cash Resources, Inc., Plaintiffs,**

v.

**E*TRADE ACCESS, INC., Defendant.**

**No. 01–1741–HU.**

United States District Court, D. Oregon.

April 30, 2003.

F. Gordon Allen, Allen & O'Halloran, Portland, OR, for Plaintiffs.

Donald E. Templeton, Elizabeth C. Knight, Dunn Carney Allen Higgins & Tongue, Portland, OR, for Defendant.

## OPINION AND ORDER

MARSH, District Judge.

Magistrate Judge Dennis J. Hubel filed Findings and Recommendation (# 57) on November 4, 2002. After reviewing his Findings and Recommendation, I was concerned that the issues of justiciability and standing were not addressed. On January 10, 2003, I recommitted the matter to Judge Hubel to address these issues in accordance with 28 U.S.C. § 636(b)(1). Judge Hubel filed a second Findings and Recommendation (# 70) on March 28, 2003, and found that there is a justiciable case or controversy, and that plaintiffs have standing to proceed with their claims. Neither party objects to the Findings and Recommendation filed on March 28, 2003. Having reviewed this Findings and Recommendation (# 70), I agree with Judge Hubel and ADOPT his Findings and Recommendation filed on March 28, 2003.

I therefore turn to the Findings and Recommendation (# 57) filed on November 4, 2002. The matter is before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R.Civ.P. 72(b). When either party objects

to any portion of a magistrate judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Both parties have timely filed objections. I have, therefore, given the file of this case a *de novo* review. I find no error. Accordingly, I ADOPT Judge Hubel's Finding and Recommendation (# 57). Plaintiff's motion for summary judgment (# 33) is GRANTED to the extent that plaintiffs seek a declaration that the 1995, 1996, and 1997 Site Location Agreements are not perpetual in nature. Plaintiff's motion for summary judgment (# 33) is DENIED to the extent that plaintiffs seek a declaration that the 1995, 1996, and 1997 Site Location Agreements are terminable at will, after reasonable notice, after the initial five year period. Finally, defendant's motion for summary judgment (# 45) is DENIED.

IT IS SO ORDERED.

## FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND STANDING

HUBEL, United States Magistrate Judge.

Plaintiffs Bancard Services, Inc. and Cash Resources, Inc., bring this declaratory relief action against defendant E*Trade Access, Inc. Defendant brings counterclaims against plaintiffs. Both parties previously moved for summary judgment. In a November 4, 2002 Findings & Recommendation, I recommended that plaintiffs' motion be granted in part and that defendant's motion be denied.

Plaintiffs and defendant both filed objections to the Findings & Recommendation which was referred to Judge Marsh for review on December 9, 2002. In a January 10, 2003 Opinion & Order, Judge Marsh declined to review the merits of the summary judgment motions and remanded the case back to me to address the issues of justiciability and standing. Following Judge Marsh's Opinion & Order, the parties submitted additional briefing. This Findings & Recommendation is issued to address Judge Marsh's Opinion & Order.

Much of the background is recited in the November 4, 2002 Findings & Recommendation and will not be repeated here. Additional relevant background will be incorporated into the discussion.

## DISCUSSION

### I. Justiciability

Shortly after plaintiffs filed the Complaint, defendant moved to dismiss the action on the basis that plaintiffs had failed to present a justiciable controversy. Plaintiffs responded to the motion. Defendant failed to file a reply in support of the motion and then withdrew the motion.

Following the withdrawal of the motion, defendant filed its Answer which included the assertion of three counterclaims against plaintiffs. First, defendant counterclaimed for declaratory relief that the renewal provisions in the Site Location Agreements are valid and enforceable. Answer at ¶¶ 9, 10. Second, defendant sought an injunction enjoining plaintiffs from contacting, soliciting, or interfering with defendant's customers. *Id.* at ¶ 13. In support of the injunctive relief claim, defendant alleges that plaintiffs have solicited defendant's customers in an attempt to persuade them to breach their contracts with defendant and switch their business to plaintiffs. *Id.* at ¶ 12. Defendant alleges that in some cases, plaintiffs have succeeded and the customers have actually breached their contracts with defendant, stopped doing business with defendant,

and started doing business with one or both plaintiffs. *Id.* Finally, defendant counterclaimed for damages for plaintiffs' interference with defendant's contracts with its customers. *Id.* at ¶ 14.

In the summary judgment materials, the parties represented that the issue of justiciability was admitted. Nonetheless, as Judge Marsh noted in his January 10, 2003 Opinion & Order, parties cannot stipulate to jurisdiction. *Richardson v. United States,* 943 F.2d 1107, 1113 (9th Cir.1991). Having now considered the issue, for the reasons explained below, I conclude that there is a justiciable controversy presented by the claims and the counterclaims in this case.

Federal courts may act only in cases and controversies. U.S. Const. art III, § 2. Similarly, the Declaratory Judgment Act applies only in "a case of actual controversy." 28 U.S.C. § 2201. "A lawsuit seeking federal declaratory relief must first present an actual case or controversy within the meaning of Article III, section 2 of the United States Constitution." *Government Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1222 (9th Cir.1998).

Declaratory judgment actions must present a "real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). Article III requires that there be a "substantial controversy ... of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.*

■ "That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action." *Associated Indemn. Corp. v. Fairchild Indus., Inc.,* 961 F.2d 32, 35 (2d Cir.1992). "The practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists." *GTE Directories Pub'g Corp. v. Trimen Am., Inc.,* 67 F.3d 1563, 1569 (11th Cir.1995) (internal quotation omitted).

Both parties cite a 1970 District of Colorado case in which the plaintiff brought an action under the Declaratory Judgment Act regarding the validity of noncompetition clauses in contracts that the plaintiff had with the defendant. *Bruhn v. STP Corp.,* 312 F.Supp. 903 (D.Col.1970). The court stated that disputes involving covenants restricting competition and statutory protection against competition, such as under patent laws, may be placed in one of three general categories for the purpose of determining whether the requirement of ripeness is met. *Id.* The court explained:

> The first category consists of those disputes where the alleged liability creating act has already occurred. This would be the case, for example, where the plaintiff has already engaged in a business violative of a covenant not to compete or has produced and/or marketed a product which assertedly infringed upon an existing patent. Absent declaratory relief the party who allegedly breached the covenant not to compete or infringed the patent would be required to wait until the adverse party brought suit before he could secure a judicial determination of the propriety of his conduct. One of the main purposes of the Declaratory Judgment Act was to allow a party to bring an action asserting his 'nonliability' in such a situation.

*Id.* at 905–06.

The court continued:

The federal courts have viewed the Declaratory Judgment Act as remedial and have given it a liberal interpretation in order to carry out its purpose. They have, therefore, normally granted declaratory relief in a second category of disputes—where an immediate controversy exists even though the act which will allegedly create liability has not as yet occurred. Such a situation arises where one or both parties have taken steps or pursued a course of conduct which will result in "imminent" and "inevitable" litigation, provided the issue is not settled and stabilized by a tranquilizing declaration.

*Id.* at 906.

Finally, the

third category [ ] includes those disputes which are not yet ripe for adjudication. The act which would allegedly result in liability—plaintiffs' acceptance of employment in violation of the covenant— has not yet occurred. Also, none of the parties have taken steps or pursued a course of conduct which will necessarily lead to litigation in the immediate future.

*Id.*

In *Bruhn,* the court found that the dispute in that case fell into the third category because none of the parties had taken steps or pursued a course of conduct which would necessarily lead to litigation in the immediate future. *Id.* The court noted that the plaintiffs had not alleged that they had sought employment or begun preparations to sell or distribute products competitive to defendant. *Id.* The plaintiffs had not alleged that defendant had threatened suit. *Id.* Answers to interrogatories indicated that the plaintiffs wished to sell or distribute products competitive to the defendant, but that none of them had any associates or business organizations with whom they planned to carry out such activities. *Id.* The court concluded that it was "clear that

plaintiffs are merely apprehensive, but have not nevertheless even begun to pursue a course of action which would lead them down the path of litigation." *Id.*

■ The facts here are distinguishable from those in *Bruhn* and demonstrate that this case falls into either the first or second category of disputes as outlined by the *Bruhn* court. As a result, the claims here are justiciable.

The evidence in the record shows that plaintiffs and defendant are competitors. Tom Durrant Declr. at ¶ 10. In the past, defendant had a contract with a truck stop in Idaho Falls, referred to as "Wright Brothers." *Id.* at ¶ 15. After the initial five-year term, Wright Brothers terminated the agreement on July 24, 2000. *Id.* at ¶ 16; Exh. 2 to Durrant Declr. Wright Brothers then entered into an agreement with Bancard Services to provide processing for the ATM machine. *Id.* at ¶ 17. Defendant, however, claims commissions for the period of time that Bancard Services has had the contract with Wright Brothers. *Id.* at ¶ 18.

Defendant uses a national collection agency named Newton & Associates, to collect on what defendant insists is the debt owing to it. *Id.* Newton sent a letter dated August 7, 2001, to Wright Brothers, seeking $27,720 allegedly owed to defendant. *Id.;* Exh. 4 to Durrant Declr. The letter states that if settlement is not made within three days, Newton/defendant will "immediately proceed with all legal remedies available." Exh. 4 to Durrant Declr.

In an August 21, 2001 letter from Newton, Newton told Wright Brothers that if Wright Brothers agreed to a new contract with defendant, defendant would waive the $27,720 in alleged indebtedness. Durrant Declr. at ¶ 20. Apparently, Wright Brothers rejected this offer. *Id.*

Internal communications from Newton employee Marcus Anthony to Newton collector John Mitchell show that Newton/defendant believed there were three options for an "amicable resolution" of the dispute with Wright Brothers: 1) Bancard Services buys out the contract at the valued amount shown; 2) Wright Brothers reinstates services with defendant, who will then waive any lost revenue between July 2000 and the present; or 3) Wright Brothers pays the value of the remaining contract. *Id.* Anthony further states that if an amicable resolution could not be reached, there would be no option remaining other than litigation. *Id.*

Newton sent Wright Brothers another collection letter on October 9, 2001. *Id.* at ¶ 23; Exh. 8 to Durrant Affid. On October 18, 2001, Bancard Services entered into an agreement with Wright Brothers to indemnify Wright Brothers from any claims made against it by defendant. *Id.* at ¶ 24; Exh. 10 to Durrant Affid. Bancard then filed this action on December 4, 2001.

Dan Willie also was a party to contracts with defendant. *Id.* at ¶ 25. He wanted to switch companies and terminated his contracts with defendant at the five-year anniversary date. *Id.* at ¶ 26; Exh. 10 to Durrant Declr. (March 19, 2001 letter regarding Flags West Truck Stop). Defendant responded to Willie's termination letter by attaching a copy of the applicable contract and circling paragraphs twelve and fifteen. Exh. 11 to Durrant Declr. Newton, on behalf of defendant, continues to send collection letters to Willie's company seeking payment of $10,577.40 allegedly owed to defendant.

Similarly, Mike Hunziker was also a party to contracts with defendant. Durrant Declr. at ¶ 30. He terminated those contracts at the five-year anniversary and presently uses Bancard Services to service his locations. *Id.* at ¶ 31. Newton is now sending collection notices to Hunziker seeking $9,441 allegedly owed to defendant. *Id.*

Finally, Jim Hansen also terminated his contract with defendant in favor of a contract with Bancard Services. *Id.* at ¶ 33. Defendant threatened him with legal action for breaching the agreement Hansen had with defendant. *Id.* at ¶ 35; Exh. 14 to Durrant Declr. Later, Newton sent a collection letter to Hansen stating that if a new contract with defendant were signed, defendant would forgive all outstanding charges. Exh. 15 to Durrant Declr. The letter further states that if a new contract is not signed, it would pursue unpaid charges of $2,376, plus $17,820 of the remaining contracted balance. *Id.*

Hansen requested that Bancard Services solve the problem within thirty days. Durrant Declr. at ¶ 36. Because Bancard Services could not do so, Hansen returned servicing back to defendant. *Id.*

As the cases cited above make clear, the controversy between the parties must be real and substantial, not hypothetical or abstract. A contingent liability suffices, if there is a reason to believe that contingencies will occur and the dispute is real. Here, the fact that the controversy is not between defendant and those parties with whom it has or had contracts is not fatal.

The evidence shows that defendant is threatening litigation against several of its former customers who have terminated their Site Location Agreements at the expiration of the first five-year period. Whether the litigation initiated by defendant is in the nature of collection on a debt or a breach of contract claim, the former customers will most certainly defend the action by arguing that the renewal provision under which defendant bases its claim, is void. Thus, an immediate controversy exists and defendant's collection efforts and threats of litigation amount to

pursuit of a course of conduct which will likely result in litigation unless the validity of the contractual renewal provision is adjudicated here.

Notably, in at least one instance, Bancard Services has agreed to indemnify defendant's former customer as to any claims brought against it by defendant. Because *Bruhn* addressed the justiciability issue in the context of contractual non-compete clauses, the plaintiff and the defendant in that case were both parties to the contract. Here, in contrast to *Bruhn*, there will never be a contract between plaintiffs and defendant because they are competitors in the marketplace. However, the fact that plaintiffs and defendant here are not parties to the contract in dispute is not inconsistent with a finding that this is a justiciable controversy.

As a result of the indemnity agreement between Bancard Services and one of defendant's customers, there is a direct relationship between Bancard Services and defendant because Bancard Services is now financially liable for any unlawful breach by the customer of the customer's contract with defendant. Thus, plaintiffs' interest in the litigation is more than abstract. The indemnity agreement makes the declaratory judgment claims definite and concrete.

Furthermore, defendant counterclaims for damages and injunctive relief arising out of plaintiffs' alleged interference with the contracts between defendant and its customers. These claims are clearly justiciable in that defendant alleges that plaintiffs' past actions have already caused damage. In fact, it is likely that some of the customers who have been the target of the alleged interference by plaintiffs are the ones plaintiffs have agreed to indemnify in any action brought against them by defendant.

Given the threatened litigation by defendant against its customers, the heart of which will be the validity of the renewal provision, given the fact that plaintiffs have agreed to indemnify at least one of defendant's former customers, and given the presence of defendant's counterclaims for injunctive relief and damages allegedly caused by plaintiffs' tortious interference with the contracts between defendant and its customers, the controversy between plaintiffs and defendant is justiciable because it is neither hypothetical nor abstract, and is instead, real and substantial.

## II. Standing

Judge Marsh was concerned that plaintiffs, "as neither parties nor third-party beneficiaries to the agreements at issue," lack standing to pursue their claims. Jan. 10, 2003 Opinion & Order at p. 2. Standing, like justiciability, derives from the Article III requirement that federal courts hear only live cases and controversies. *PLANS, Inc. v. Sacramento Unified Sch. Dist.*, 319 F.3d 504, 507 (9th Cir.2003). Standing embodies the concept that there be a personal interest in the litigation. *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 2003 WL 751319, at *12 (9th Cir.2003); *see also Hall v. Norton*, 266 F.3d 969, 975 (9th Cir.2001) ("[t]he standing inquiry focuses upon '[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy[.]' ") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

■ There are three constitutional standing requirements: (1) the plaintiff must have directly suffered an "injury in fact," (2) the injury must be fairly traceable to the defendant's conduct, and (3) a favorable court decision must be likely to redress the injury. *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1019 (9th Cir. 2002).

■ In addition, courts have developed several "prudential" standing requirements including "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The prudential component of standing precludes the exercise of federal jurisdiction even where the Constitution's "irreducible minimum" requirements have been met. *Oregon Advocacy Center,* at 1108.

### A. Constitutional Requirements

■ "Injury in fact" may be met by the assertion of an imminent competitive injury. In *Viceroy Gold Corporation v. Aubry,* 75 F.3d 482 (9th Cir.1996), the plaintiff sued California labor officials for declaratory and injunctive relief, arguing that California statutes permitting only unionized mining workers to work more than eight-hour days was preempted by federal law. The plaintiff operated a nonunion mine. The plaintiff's employees, most of whom lived seventy-five or more miles from the operation, requested a change in hours so that they could work twelve, rather than eight, hours a day, but fewer days per week. California law generally prohibited mine workers from working more than eight hours in a twenty-four hour period, but an exception allowed employees subject to a collective bargaining agreement to craft a different arrangement for the number of hours worked in a day.

The defendants argued that the plaintiff lacked standing to bring its claims. Both the district court and the Ninth Circuit rejected the defendants' argument. The court explained that the "competitive disadvantage [the plaintiff] suffers relative to

unionized mines and the pressure to unionize, is an injury in fact." *Id.* at 488.

The *Viceroy Gold* court cited a lower court decision for support. *Associated Builders & Contractors, Golden Gate Chapter, Inc. v. Baca,* 769 F.Supp. 1537 (N.D.Cal.1991), *aff'd,* 64 F.3d 497 (9th Cir. 1995). There, a builders' association and the Chamber of Commerce of the United States challenged local government resolutions requiring payment of "prevailing wages" to construction employees before issuance of building permits for private construction projects. The defendants argued that the plaintiffs lacked standing because no specific showing of injury had been made and the economic consequences on the association's members was uncertain.

The court concluded that the plaintiffs had standing because the resolutions "directly affect contractors, such as [the association's] members, who do not now pay the prevailing wage rates." *Id.* at 1542. The court noted that the "economic consequences to [the association's] members, both in terms of increased direct costs and reduced competitiveness within the construction industry, satisfies the injury-in-fact requirement." *Id.*

In an earlier case, the Ninth Circuit noted that competitive injuries "have often been recognized as grounds for standing." *Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 506 (9th Cir.1988).

There, independent film makers, film production and distribution companies, and a membership organization, brought claims alleging the unconstitutionality of certain regulations adopted by the United States Information Agency (USIA) which implemented the "Beirut Agreement," a multilateral treaty aimed at facilitating the international circulation of educational, scientific, and cultural audio-visual materials. Under the treaty, qualifying materials re-

ceive certain benefits, including exemption from import duties. A certificate of international character is required to receive treaty benefits.

Under the rules adopted by the USIA, several of the plaintiffs' films were denied a certificate of international character. As a result, the plaintiffs had to pay customs duties to export to Canada four of their files. The court held that this pecuniary injury satisfied the "injury in fact" prong of the standing analysis. *Id.* at 506. The court went on, however, to note that even without having incurred the customs duties, the plaintiffs showed "injury in fact" by alleging that the denial of benefits under the Beirut Agreement put "their files at a competitive disadvantage in the international marketplace, resulting in the loss of sales." *Id.* The court further explained that because it was undisputed that a certificate of international character was an " 'indispensable prerequisite' to the realization of benefits under the [Beirut] Agreement[,]" the denial of the USIA certification worked a "cognizable injury" to the plaintiffs' "ability to compete for benefits under the [Beirut] Agreement." *Id.* Such a competitive injury sufficed for standing.

In another case, the First Circuit recognized the premise that a plaintiff's status "as a *direct competitor* whose position in the relevant marketplace would be affected adversely by [ ] challenged governmental action[ ]" met the "injury in fact" requirement for constitutional standing. *Adams v. Watson,* 10 F.3d 915, 922 (1st Cir.1993).

The Third Circuit accorded standing to a plaintiff in such a situation. *UPS Worldwide Forwarding, Inc. v. United States Postal Serv.,* 66 F.3d 621, 626 (3d Cir. 1995). There, the plaintiff brought suit alleging that a new "International Customized Mail" (ICM) service offered by the defendant, involving negotiated, individual agreements with customers capable of tendering large quantities of international mail, violated the Postal Reorganization Act.

The defendant argued that the plaintiff lacked standing, but the court rejected the argument. The court explained that

> there is no dispute that UPS meets the constitutional standing requirements. First, as a competitor of the Postal Service with authority to compete in the international parcel delivery market, ... UPS stands to lose clientele lured to the Postal Service by the ICM service. Although UPS may not have demonstrated any lost business yet, the "injury in fact" component of standing merely requires that such injury be "imminent."

*Id.* (footnote omitted).

■ Based on the authority of these cases, I conclude that plaintiffs meet the "injury in fact" constitutional standing requirement. As noted above, plaintiffs and defendant are competitors in the relevant ATM transaction processing industry. Because defendant's contracts with various locations contain, according to defendant, a valid perpetual renewal provision, plaintiffs are prevented from competing in the industry. Thus, plaintiffs suffer a competitive injury.

The injury is more than imminent because, in at least one instance, a customer of defendant's who switched to service with plaintiffs, returned to a contract with defendant upon threat of litigation by defendant, depriving plaintiffs of that customer's business. Additionally, as noted above, plaintiffs have now agreed to indemnify at least one of defendant's former customers against any action brought against that customer by defendant, in order to keep that customer. Thus, plaintiffs establish an imminent competitive injury sufficient to show "injury in fact."

Next, there is a "fairly traceable causal connection" between plaintiffs' injury and the challenged conduct. The connection is demonstrated by the contested perpetual renewal and exclusive dealing provisions of the Site Location Agreements which defendant continues to assert as the basis for its threats against former customers who now do business with plaintiffs. The conduct of defendant that is challenged has already resulted in plaintiff agreeing to indemnify a customer defendant allegedly continues to threaten with litigation. Conversely, plaintiff's conduct is the alleged cause of defendant's damages sought in its counterclaim.

Finally, there is a substantial likelihood that the relief requested will redress or prevent the injury because should the challenged provisions of the Site Location Agreements be found invalid, defendant will be unable to enforce those provisions against its customers or against plaintiffs in its tortious interference claim. Likewise, the damages defendant seeks in its counterclaim are the only sort of remedy available to redress defendant's alleged injury.

### B.  Prudential Requirements

Here, because plaintiffs are actually attempting to compete and that competition is being stifled by an allegedly illegal contract, plaintiffs assert their own rights and do not rest their claims on the legal rights or interests of third parties. *See UPS Worldwide Forwarding*, 66 F.3d at 627–28 (finding prudential requirement of asserting own injury satisfied because ICM service, if permitted under the Postal Reorganization Act, would injure plaintiff even though other persons such as mailers, may also suffer injury). Furthermore, with plaintiffs agreeing to indemnify Wright Brothers, plaintiffs insert their own obligations and rights into the relationship between defendant and its customers.

Next, the injury alleged by plaintiffs is not shared in substantially equal measure by all or a large class of citizens. Finally, to the extent the "zone of interest" prong plays a role in a case not involving a constitutional challenge to a statute, I conclude that plaintiffs' interest is arguably within the zone of interests regulated by the contract at issue. The effect of the challenged provisions in the Site Location Agreements is to "regulate" the ATM processing industry by perpetually "locking up" locations and preventing other entities from competing for this business. The combined effect of the perpetual renewal and non-competition agreements (along with the tort of intentional interference of contract) perpetually eliminates plaintiffs from the marketplace. Thus, while the Site Location Agreements directly regulate the relationship between defendant and its customers, the Agreements indirectly target the potential relationship between the locations and third-party competitors such as plaintiffs. This is sufficient to satisfy the prudential standing concerns.

### CONCLUSION

I conclude that the claims at issue in this case present a justiciable controversy and that plaintiffs have standing to pursue the action.

### SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 14, 2003. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 28, 2003, and the review of the Findings and

Recommendation will go under advisement on that date.

March 28, 2003.

## OPINION AND ORDER

MARSH, District Judge.

Magistrate Judge Dennis J. Hubel filed Findings and Recommendation on November 4, 2002. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). When either party objects to any portion of a magistrate judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

■ Both parties have timely filed objections. I have, therefore, given the file of this case a *de novo* review. I am concerned that the issues of justiciability and standing have not been addressed. Despite plaintiffs' representation in their memorandum in support of their motion for summary judgment that the issue of justiciability is admitted, parties cannot stipulate to jurisdiction. *See Richardson v. United States,* 943 F.2d 1107 (9th Cir. 1991). In addition, the parties have failed to address whether plaintiffs, as neither parties nor third-party beneficiaries to the agreements at issue, have standing to pursue their claims. These two issues must be addressed before I shall consider the merits of the summary judgment motions.

Thus, in accordance with 28 U.S.C. § 636(b)(1), I recommit this matter to Judge Hubel with instructions to address the issues of whether there is a justiciable case or controversy, and whether plaintiffs have standing to proceed with their claims.

IT IS SO ORDERED.

## FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge.

Plaintiffs Bancard Services, Inc. and Cash Resources, Inc., bring this declaratory relief action against defendant E*Trade Access, Inc. Both parties move for summary judgment. I recommend that plaintiffs' motion be granted in part and that defendant's motion be denied.

## BACKGROUND

Plaintiff Bancard Services is a Montana corporation. Plaintiff Cash Resources, Inc. is a Colorado corporation. Bancard and Cash Resources maintain and service ATM machines on business premises pursuant to written service agreements.

Defendant is an Oregon corporation which competes with plaintiffs in the ATM industry. Defendant markets, installs, and services ATMs throughout the United States. As a result of defendant's acquisition of a company called Card Capture Services, Inc. (CCS), an Oregon corporation with many ATM service agreements, defendant is the successor to CCS's service agreements.

The CCS contracts which defendant acquired give defendant the exclusive right to service the ATM machines. The contracts are known as "Site Location Agreements." They were entered into with numerous businesses or "Locations" across the country. Among other things, each Location agreed to place a particular ATM model on its premises and make the ATM available to Location customers during normal business hours. CCS agreed to pay the Locations for each transaction at the ATM.

There are several different versions of the Site Location Agreements. The three of interest in this lawsuit are the 1995, 1996, and 1997 versions. The 1995 and

1996 versions contain the following provision:

> 12. *Term.* This Agreement shall be for a term of five (5) years from the date of installation, unless amended or terminated by written agreement signed by both Company and Location or terminated by Company pursuant to paragraph 15, below. Notwithstanding anything contained herein to the contrary, Company shall have the option, in its sole discretion, to extend this Agreement for additional periods of five (5) years each.

Exhs. 1 and 2 to Stip. Related to Discovery at ¶¶ 12.

The 1997 Agreements contain the following renewal language:

> This Agreement shall be for a term of five (5) years from the date of installation, unless amended or terminated by written agreement signed by both Company and Location, or terminated as set forth below. Upon the expiration of the initial term, this Agreement may be renewed by Company for an additional period of five (5) years.

Stip. Related to Discovery at ¶ 6.

The parties agree that all of the CCS Site Location Agreements acquired by defendant also provide that they are to be construed, interpreted, and enforced in accordance with Oregon law.

Plaintiffs have urged, and want to continue to urge, defendant's Locations to switch transaction processing providers. Plaintiffs want to assure those Locations that they can terminate their contracts with defendant without liability. If plaintiffs are wrong about their interpretation of Oregon law as applied to these contracts, plaintiffs fear that they run the risk of substantial liability to both customers and defendant. Plaintiffs are concerned that defendant may sue them for tortious interference with contract. Thus, they seek a declaratory judgment determining that the above contract language consti-

tutes an invalid perpetual agreement terminable at will under Oregon law.

Defendant counterclaims for declaratory and injunctive relief. Defendant seeks a declaration that the renewal provisions are valid and enforceable. Defendant seeks an injunction enjoining plaintiffs from contacting, soliciting, or interfering with defendant's customers. Defendant also counterclaims for damages for plaintiffs' actions in soliciting defendant's customers which have resulted in those customers breaching their contracts with defendant and doing business with one or both plaintiffs instead.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.' " *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991) (quoting *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31.

If the factual context makes the non-moving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Id.; In re Agricultural Research and Tech. Group,* 916 F.2d 528, 534 (9th Cir.1990); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987).

## DISCUSSION

Plaintiffs make two arguments: (1) that the renewal provision lacks the language required to establish a valid perpetual agreement and thus, the contracts are, in fact, terminable at will with reasonable notice after the expiration of the initial five-year term; and (2) that even if the provisions are construed as perpetual agreements, they are void because they act as a restraint of trade. For the reasons explained below, I agree with plaintiffs that the renewal provision does not create a valid perpetual agreement and thus, I do not reach the alternative restraint of trade argument.

There appear to be three relevant Oregon cases. First, in a 1955 Oregon Supreme Court case, the court resolved an issue regarding the perpetual nature of a real property lease. *McCreight v. Girardo,* 205 Or. 223, 287 P.2d 414 (1955). The relevant provision in the lease stated: "Lessee shall have the option of renewal of this lease, on the same rental basis and on the same terms, from year to year, for a like period of one year." *Id.* at 231, 287 P.2d at 415.

The court generally noted that "perpetual leases are not favored and ... a perpetual renewal clause will not be upheld unless the renewal provision be clear and unambiguous." *Id.* at 235, 287 P.2d at 417 (internal quotation omitted). The court explained that this was "not a rule that parties may not enter into an enforceable agreement for successive renewals of a lease.... It is a rule of construction." *Id.* (citation omitted).

> Covenants for continued renewals are not favored, because they tend to create a perpetuity; hence, the courts will not construe a lease as conferring a right to perpetual renewals, unless it clearly so provides in unequivocal language so plain as to leave no doubt of the purpose.

*Id.* (internal quotation omitted).

The court found that the lease's renewal provision did not create a perpetual lease:

> The term 'from year to year', in connection with a renewal right, is construed almost universally to provide for but a single renewal, the courts stating that the words do not in themselves import an intention to provide for perpetual renewals, such as the clear and unambiguous words 'in perpetuity', 'forever', or words of similar import.....
>
> The words 'for a like period of one year' do not aid the defendant for they import no more than that the term of renewal shall be on a yearly basis.
>
> The instrument before us provides for but a single renewal of the lease.

*Id.* at 239, 287 P.2d at 419.

In a 1973 case, the court reiterated the general principle that "perpetual agree-

ments are disfavored[.]" *Portland Section of the Council of Jewish Women v. Sisters of Charity of Providence in Or.*, 266 Or. 448, 456, 513 P.2d 1183, 1187 (1973). The court also noted that although disfavored, "where clearly provided for [perpetual agreements] will be enforced according to their terms." *Id.* The court noted that in determining whether an agreement is perpetual, "[a]ll circumstances of each case must be considered in reaching a conclusion and, if consideration for the promise is fully executed, courts are reluctant to hold the promise terminable." *Id.*

The *Sisters of Providence* court easily determined that the provision at issue was a perpetual agreement because of language which read: "first party hereby agrees to furnish ward accommodation in perpetuity to one . . . ." *Id.* at 456 n. 1, 513 P.2d at 1187 n. 1. The court described the contract as "clearly perpetual by its terms[.]" *Id.* at 456, 513 P.2d at 1188.

The *McCreight* and *Sisters of Providence* cases are consistent in that they both express the general statements that perpetual agreements are disfavored, but will be upheld when a contract contains clear and unambiguous terms describing its perpetual nature. In *McCreight* where there was a renewal clause which contained no such terms, the agreement was not perpetual and was terminable. In contrast, in *Sisters of Providence* where the parties used the term "in perpetuity" in the renewal clause, there was a clear expression of the parties' intent.

In 1998, the Oregon Court of Appeals considered a case concerning country club memberships. *Paul Gabrilis, Inc. v. Dahl,* 154 Or.App. 388, 961 P.2d 865 (1998). There, the plaintiff country club attempted to terminate certain membership agreements. The defendant members argued that the agreements were perpetual and non-terminable. The court held for the defendants.

The plaintiff argued that because the agreements contained no definite term on their duration, they were terminable at will by either party. *See Lund v. Arbonne Int'l, Inc.,* 132 Or.App. 87, 90, 887 P.2d 817, 820 (1994) (reciting general proposition that contracts that are for an indefinite period may be terminated at will with reasonable notice).

The court stated that the plaintiff's reliance on this general rule was "misplaced." *Gabrilis,* 154 Or.App. at 394, 961 P.2d at 868. The court explained:

It is true that if there is nothing in the nature or language of a contract to indicate that the contract is perpetual, courts will interpret the contract to be terminable at will on reasonable notice. Nevertheless, where provided for, perpetual agreements will be enforced according to their terms. . . . All the circumstances of each case must be considered in reaching a conclusion on the intended duration of the contract.

*Id.* (citation omitted).

The court then assessed several provisions in the contract and· concluded that taken together, the memberships were intended to be perpetual, in force as long as the members continued to pay their dues and to abide by the club's rules. *Id.* The court concluded that "[b]ecause the membership agreements contain a number of provisions inconsistent with a conclusion that the agreement is terminable at will, . . . the trial court correctly concluded that the agreements could be terminated only for cause." *Id.* at 395, 961 P.2d at 868.

One distinguishing fact about *Gabrilis* is that the agreement there lacked an express renewal provision. As a result, the court was not directed to the actual text of a particular clause. Without an express renewal provision, the contract was ambiguous on the perpetuity issue and the court

went beyond the text to the context of the other contractual provisions to interpret the perpetual nature, or lack thereof, of the agreement. In contrast, in *McCreight* and *Sisters of Providence,* the contracts at issue in those cases contained an express renewal clause that controlled the court's analysis. Neither of those two cases discussed other contractual language.

Plaintiffs rely heavily on *McCreight.* Because the renewal provisions of the 1995, 1996, and 1997 Site Location Agreements contain no words such as "perpetual" or "forever," plaintiffs argue that under *McCreight,* there is no plain and unambiguous statement of a perpetual renewal and no reason to imply or construe such a right of renewal.

Plaintiffs argue that *Gabrilis* is the "flip side" of the instant case because there, there was no express duration provision and all other provisions suggested an intention that the agreement be perpetual. Plaintiffs argue that here, the opposite is true. Plaintiffs note that none of the provisions that one would expect in a perpetual agreement are present. Plaintiffs note that there is no provision for negotiations, adjustment, and accommodations that changing circumstances would undoubtedly require over a long period of time. Plaintiffs contend that there are no express provisions in the Site Location Agreements that when "taken together," lead to the conclusion that the parties intended a perpetual agreement.

In contrast, defendant argues that plaintiffs' reliance on *McCreight* is misplaced. Defendant notes that there, the issue was a real property lease. Additionally, defendant notes that the "from year to year" and "for a like period of one year" language in that lease agreement was ambiguous and thus, because the renewal provision was not expressed in plain and unambiguous terms, the court found that it was not perpetual.

Here, defendant argues, the renewal clause of the 1995 and 1996 Site Location Agreements is clearly perpetual because it states that defendant can extend the agreement "for additional periods of five (5) years each." Defendant argues that the words are not open to interpretation because they are stated in plain and unambiguous terms.

Both parties also cite a Washington case cited in the *McCreight* case. In *Tischner v. Rutledge,* 35 Wash. 285, 77 P. 388 (1904), the court construed a real property lease which contained a provision for monthly rent terminating in April 1901 "with the privilege at the same rate and terms each year thereafter from year to year." *Id.* at 286, 77 P. at 388. In determining that the lease did not create a right of perpetual renewal, the court noted the absence of terms such as "in perpetuity" and "forever" or words to that effect. *Id.* at 289, 77 P. at 389. As to the actual language of the renewal provision, the court explained:

> Moreover, the phrase used which is thought to create the perpetual right is of itself likely to conceal its real meaning. When we speak of a thing as continuing from year to year, it is only on second thought that we conclude it means forever. This we do not think is the direct and unequivocal language necessary to create a lease of the character contended for.

*Id.* at 289 77 P. at 389–90.

Plaintiffs argue that because the renewal provision in the instant case lacks the clear and unambiguous words of "in perpetuity" or "forever," the provision requires a "second thought" to conclude it is perpetual as expressed in *Tischner* and thus, the language is insufficient to create a perpetual renewal provision. Conversely, defendant argues that it is inconceivable how the provision at issue here could re-

quire a "second thought" to construe its perpetual meaning.

■ The language in the renewal clause in the 1995 and 1996 versions of the Site Location Agreements is materially different from that seen in the 1997 Site Location Agreements and must be separately analyzed. As to the 1995 and 1996 version, I agree with plaintiffs that without language such as "forever," or "in perpetuity," the clause is not clear and unambiguous enough to demonstrate that the parties intended to create a perpetual agreement.

First, I reject defendant's assertion that cases interpreting real property leases are inapplicable to the lease here. Defendant cites no cases upholding this distinction and I have found none. More importantly, I see no fundamental reason why the renewal provision of a real property lease and the lease at issue here should be examined differently.

Second, I do not read *Gabrilis* as being at odds with *McCreight* and *Sisters of Providence*. The latter two cases were decided before the Oregon Supreme Court refined its analysis for resolving contractual ambiguities. In *Yogman v. Parrott*, 325 Or. 358, 361, 363, 937 P.2d 1019, 1021, 1022 (1997), the court set forth the procedure as requiring first an analysis of the text of the disputed term, then an analysis of the context within the contract as a whole. *McCreight* and *Sisters of Providence* are cases where examination of the renewal terms in question resolved the question. In *Gabrilis*, the court had to go one step further to examine the context of the disputed term within the contract as a whole. Unlike *Gabrilis*, the contract at issue here contains an express renewal clause and thus, the focus of the analysis is initially on the text appearing there. Because of the lack of words such as "forever" or "perpetual," the language is ambiguous enough to require a "second thought" to conclude it is perpetual and thus, as in *Tischner*, it is

insufficient to create a perpetual renewal provision.

■ Additionally, examining the renewal clause in the context of the contract as a whole, the renewal provision still fails to clearly create a perpetual renewal. The only provision that could possibly suggest that the Site Locations Agreements were intended to be perpetual is the cancellation provision under which either party can terminate the lease in the event the other party defaults. Exhs. 1 and 2 to Stip. Rel. to Dis. at ¶¶ 15.

Under *Gabrilis*, the inclusion of specific grounds for termination in an agreement can, but does not always, indicate that the agreement may be terminated only for cause. *Gabrilis*, 154 Or.App. at 395, 961 P.2d at 868. Here, however, the provision is better understood as a default provision rather than a termination for cause provision. Therefore, it is not indicative of a perpetual agreement.

Based on the requirement that the perpetual nature of the agreement be expressed in clear and unambiguous language, and the lack of such language in the 1995 and 1996 agreements, I conclude that the renewal provision in these agreements does not create perpetual renewals.

While I agree with plaintiffs that the 1995 and 1996 Site Location Agreements are not perpetual, I disagree with plaintiffs that they are terminable at will with reasonable notice after the initial five-year contract period. As noted in *McCreight*, phrases such as "from year to year" do not support a perpetual agreement, but will support a single renewal. *McCreight*, 205 Or. at 239, 287 P.2d at 419. As explained in a West Virginia case, phrases such as "from year to year" or "a like period of time" do not create a perpetuity, but will provide for one additional term, equal to the first. *Lawson v. West Virginia News-*

*paper Pub. Co.,* 126 W.Va. 470, 29 S.E.2d 3 (1944).

There, the court stated that

[a] general covenant to renew or a covenant to renew with like terms, conditions, and covenants, does not import a renewal covenant in the renewal lease.... It is quite plain that a lease containing a covenant to renew at its expiration with similar covenants, terms, and conditions contained in the original lease is fully carried out by one renewal without the insertion of another covenant to renew. Otherwise a perpetuity is provided for.... It is the rule that a provision in a lease in general terms for a renewal or continuance of the lease will be construed as providing for only one renewal.... A general covenant to extend or renew implies an additional term equal to the first, upon the same terms, including that of rent, except the covenant to renew; to include which would make the lease perpetual.

*Id.* at 4–5 (citations and internal quotations omitted).

While the renewal provisions in the 1995 and 1996 Site Location Agreements cannot be sustained as perpetual, the words the parties used giving defendant the option to renew, in particular the words allowing defendant "to extend this Agreement for additional periods of five (5) years each[,]" clearly suggest that the parties intended a period of renewal. Following the discussion from *Lawson* and *McCreight* concerning renewal provisions, the proper construction of the language in the 1995 and 1996 Agreements is that after the initial five-year period, there is one additional renewal period at defendant's option. Following that one renewal, the 1995 and 1996 agreements are terminable at will by either party with reasonable notice.

As for the 1997 Site Location Agreement, the renewal provision there clearly provides for a single five-year renewal period. The language, "an additional period of five (5) years" cannot reasonably be interpreted any other way. Thus, with the 1997 Site Location Agreements, the Agreements are valid for an initial five-year period and may be renewed by defendant for one additional five-year term. As with the 1995 and 1996 agreements, after the one renewal, the 1997 agreements are terminable at will by either party with reasonable notice.

## CONCLUSION

I recommend that plaintiffs' motion for summary judgment (# 33) be granted to the extent that plaintiffs seek a declaration that the 1995, 1996, and 1997 Site Location Agreements are not perpetual in nature. I recommend that plaintiffs' motion be denied to the extent that plaintiffs seek a declaration that the 1995, 1996, and 1997 Site Location Agreements are terminable at will, after reasonable notice, after the initial five-year period. I further recommend that defendant's motion for summary judgment (# 45) be denied.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due November 19, 2002. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due December 3, 2002, and the review of the Findings and Recommendation will go under advisement on that date.

November 4, 2002.